263 N.J. Super. 575 (1993)
623 A.2d 775
ROBIN A. LAHUE, PLAINTIFF-RESPONDENT,
v.
ANTHONY PIO COSTA, III, LOUIS ALBERGATO, JR., AS TRUSTEE FOR THE ANTHONY PIO COSTA, IV TRUST AND LOUIS ALBERGATO, JR., AS TRUSTEE FOR THE CARMEN PIO COSTA TRUST, DEFENDANTS-APPELLANTS. IN THE MATTER OF THE ESTATE OF ANTHONY PIO COSTA, II, DECEASED. ANTHONY PIO COSTA, III, APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 15, 1993.
Decided April 8, 1993.
*579 Before Judges J.H. COLEMAN, SHEBELL and CONLEY.
Kevin H. Marino argued the cause for appellants (Robinson, St. John & Wayne, attorneys, Joseph P. LaSala, Edward A. Hartnett and Mr. Marino, on the brief).
Frederick L. Whitmer argued the cause for respondent Robin A. Lahue (Pitney, Hardin, Kipp & Szuch, attorneys, Eileen A. Lindsay and Mr. Whitmer, on the brief).
Deanne M. Wilson argued the cause for respondent Rosalind Pio Costa (Mound, Cotton & Wollan, attorneys, Ms. Wilson of counsel, Patrice M. Renner, on the brief).
The opinion of the court was delivered by CONLEY, J.A.D.
These three consolidated appeals arise from an oral settlement of five separate pieces of litigation between the parties that plaintiff, Robin A. Lahue, contended defendant, Anthony Pio Costa, III, had agreed to on January 22, 1991, and thereafter reneged on. Plaintiff filed a motion to enforce which, following three days of testimony from the critical players in the negotiations, the trial judge granted. A final judgment enforcing the settlement was entered May 14, 1991. Subsequently, defendant's motion for reconsideration was denied by an order entered September 10, 1991. Defendant appealed both orders (A-1050-91T2) and refused to execute documents needed to effectuate the settlement. A motion to compel execution was granted and an order was entered November 20, 1991. Defendant appealed that order (A-1647-91T2). Defendant's third appeal (A-0076-91T2) is from a probate consent judgment required under the settlement and, as such, entered by the trial court on July 19, 1991. We affirm.
*580 Plaintiff and Anthony Pio Costa, III, defendant are siblings. When their father died in 1974, he left substantial property and business interests to his wife, Rosalind, and his two children. These properties and business interests involve: 1) Anton Company, a partnership in which defendant and plaintiff are equal partners and which owns improved properties, identified as B4, B5, B7, B9, B11 and B14, in an industrial park, and which also owns vacant land in Riverdale, Montville and Mansfield; 2) Windbeam Company, a partnership in which plaintiff and defendant are equal partners and which owned or owns properties that have been or are being condemned by the State; 3) a residuary trust of which the parties are the remaindermen and their mother the income beneficiary, and which owns vacant property in Riverdale, Montville, Mansfield, Pequannock, Denville, Mount Arlington and Roxbury; 4) Pio Costa Enterprises, a partnership in which the residuary trust and Rosalind are equal partners and which, similar to Anton Company, owns buildings, identified as B1, B2, B3, B6, B8, B15, B16, in the same industrial park where the Anton Company properties are located.
Over the years, numerous disputes arose between the parties, leading to the filing of five separate complaints. In June 1987, plaintiff filed an action, Lahue v. Pio Costa, et al., Docket No. C-6805-87 (the Anton case), seeking to dissolve and distribute the assets of the Anton Company. In October 1987, she filed another action, Lahue, et al. v. Pio Costa, el al., Docket No. C-7763-87, seeking to recover damages for Pio Costa's alleged "looting" of a family-owned company. In February 1989, she filed a probate action, In the Matter of the Estate of Anthony Pio Costa, III, Deceased, Docket No. 11216-D, seeking both an accounting of the residuary trust and the removal of defendant as a trustee. In January 1990, defendant filed an action against plaintiff, Albergato, et al. v. Lahue, Docket No. C-43-90, seeking to dissolve a business partnership between them. In August 1990, he filed a second complaint in In the Matter of Anthony Pio Costa, II, Docket No. 11216-D seeking confirmation *581 of a sale of trust property pursuant to a contract with Pio Costa Enterprises.[1]
Serious negotiations over settlement of all of the litigation between the parties began in May 1990 and continued through to the end of November 1990 when a basic agreement to a "global" settlement was sketched out. During these negotiations, defendant was represented primarily by Donald A. Richards, and plaintiff primarily by Kenneth J. Norcross.
The thrust of the global settlement was that "everyone wants to get rid of everyone else." Because of the complexity of the interrelationships between the parties in their various property and business interests, the terms of such a settlement were extensive and complicated by the potential triggering of the Environmental Cleanup Responsibility Act, N.J.S.A. 13:1K-6 to -13 (ECRA), in the event of a transfer of properties or interests in properties. But as crystallized in November 1990, and as described by Mr. Norcross, the terms of such a settlement were:
[Robin] would receive from Windbeam, the Berlin property, that would be in redemnification of all her interests in Windbeam, except for a one  one percent interest as a general partner, because if we had done it for the full interest, that would have been an ECRA trigger. So, I leave her in as a one percent general partner of Windbeam. Tony  Robin would then sell that one percent general partnership interest to Tony and Tony would pay her one dollar. You can now take advantage of the  of the exclusion from ECRA, because you have a sister to brother transfer of that one percent interest. Okay. On  Anton property, and the  the global settlement, Tony was going to receive the 11  no, Tony was going to be redeemed out of Anton and he would receive the Tonyspecial [sic] capital account property. Whatever that  that is. And that would be an ECRA trigger. He would have to take care of that. He would also receive the B9, B  was  is  B7, B9.
....
[Anthony would be] [r]edeemed out of Anton. He would receive fee simple. His  his Tony or special capital account property, whatever that is. He would also receive the B7 and B9 properties. Now, as I just told you, if the B7 and B9 *582 properties had actually physically been transferred, that would have been an ECRA trigger. So, instead of transferring B7, B9 properties, we're going to master lease them from Anton to Tony for a 90-year term, for the rent of $1, that would not be an ECRA trigger. So, Tony would be the master lessee. He would be right, to receive as master lessee, the fee interest, in those properties, upon  ECRA, he would trigger at any time at his option. That's the way to go 
....
The lessor would be the Anton partnership and the lessee at that point would be Tony. That's the situation  will change very quickly, but that's what it would be right at that time. Tony would be redeemed out, except for one percent general partnership interest. That one percent interest would be sold. Robin  Robin for $1. Once again, voiding ECRA. Now, the residuary trust would be bifurcated. We would form two  well, form one new trust called the Robin trust. The Robin trust. Rosalyn [sic] remains as incumbent officiary. And Robin would be the only remainder. Ideal would be she's then going to forfeit her interest in the residuary or the  the  give up her interest in the residuary trust. The Robin trust. The  similarly, the Pio Costa Enterprises, is going to be bifurcated. The way we're going to just do that is form a partnership which the Robin partnership. Now, in this bifurcation, the residuary  oh, sorry. I have to go back. Anton  Tony was also going to get out the Montville and Mansville properties out of Anton. He gets them in fee simple. Those are vacant lands. Not ECRA triggers. Okay.
....
To bifurcate the residuary trust, in that bifurcation, we would send the Riverdale, Denville and Mount Arlington properties over to the Robin trust and fee simple. And the other properties would be  remain in the residuary trust. The other properties being Pequannock and Montvale, to stay in the residuary trust. With respect to the PCE properties, which now we're talking about here, they are these B1, 2, B1, 2, 3, 6, 8, 15, 16, we had similarly  have a master lease concept where the B-1 and B6 properties would be liened by PCE to the Robin partnership. Okay. So the Robin partnership would be the master lessee. Again, to $1 for 90 years. The Robin partnership would have a right to require fee simple title in those properties, upon compliance and ECRA and required subdivision approvals. Because again, PCE is one block and lot. All right. We then enter into a like kind exchange.
....
Now, the Robin partnership and Tony will engage in a like kind of exchange. The Robin partnership were  will transfer the least hold interest on B1 and B6 to Tony and Tony is going to transfer the B7 property to the Robin partnership. And also the B10 property to the Robin partnership. That is, he is going to cause Windbeam to transfer the B10 property down to the Robin partnership. Okay. So then, in the interest of the Robin partnership, go up to Tony and Windbeam and in exchange for the B7 and the B10 property coming down. Okay. Now, the  and this B10 property coming down is also going to be a master lease concept and initially, but again, giving you the right fee simple, when you comply with ECRA.

*583 ....
What will happen, when all is said is done is that Robin Anton and the Robin partnership and Robin trust, all of these entities are essentially after everything is gone, Robin, they are  they are entities referred to them generally as Robin. All four Robins [sic] interest. Similarly, Tony is  Tony's trust, Windbeam, PCE, residuary trust, all for Tony. All right. When all is said and done, under the global settlement, Robin will either own, be the master lessee and the master lessor of all  all the properties in the Route 46 side of the block. And Tony and his related entities will be either the owner, master lessee, master  master lessor of everything on the P  on the Bloomfield Avenue side of the park. So, by doing those series of transactions, you've effected a division of the park. Since essentially right down the middle, which was the purpose now.
Drafts of various documents needed to effectuate a settlement along these lines were prepared by Mr. Norcross and sent to defendant's attorneys.
By January 1991, however, no agreement had been reached. On January 22, 1991 the Anton case was scheduled for trial. Defendant was at that time represented by William M. Laufer and Robert Smith; plaintiff was represented by Mr. Norcross and Eileen A. Lindsay. Both Norcross and Lindsay were confident about the outcome of the Anton litigation which sought the dissolution of the parties' partnership involved in that company. But they all knew judicial dissolution of the partnership would cause property transfers that would potentially trigger ECRA. "So, [Mr. Norcross] said, to [Mr. Laufer], that if there was some way we could settle, just Anton and  and structure it in such a way to minimize the transactional kind of costs, we would be willing to do it."
Because both parties indicated to the trial judge that settlement was a possibility, the trial did not commence immediately. Negotiations initially focused on the Anton case solely. By late morning, however, negotiations had recommenced on the global settlement, which became known as the modified global settlement. Ultimately, according to Mr. Norcross, an agreement as to division of the properties, was reached:
Okay. The Anton and Robin and Tony are partners of Anton. Robin, Tony are the remaindants of the residuary trust. Robin, income beneficiary of trust. Rosalyn [sic], residuary trust of PEC. Okay. B7, B9, would be leased by Anton to Tony, same master lease arrangement. We talked about before. *584 Residuary trust would be bifurcated, so  have to be Robin trust and residuary trust. Robin would give up her interest in the residuary trust. Robin would be the remaindant of Robin trust and Rosalyn [sic] would be the income beneficiary of Robin trust. The partnership would also be bifurcated. The Robin partnership, which of  which, the Robin trust, Rosalyn [sic] would be the partner, the B1, B6 properties, would be the master lease by PCE to the Robin partnership. Tony, Robin partnership would then enter into an exchange. Tony would sign this lease hold [sic] interest in the B7 B9 properties and Robin partnership would transfer, signed her interests, signs interest in the B1, B6 properties. So that when all is said and done, Tony and Rosalyn [sic] on one side of the transaction, owned all of the PCE side of the park and Robin, Rosalyn [sic] on the other side, owned all the Anton properties. This division of the raw land, Tony would keep the Montville, Pequannock properties, and he would get the Montville property out of Anton. The other properties would  are residuary trusts, would go over to Robin trust. On the property, vacant land, owned by Anton, stay in Anton.
Q. And how specific  specifically in terms of division of property, how did this differs [sic] from the global settlement in November?
A. Mansfield properties not going to Tony. And Windbeam keeps the B10 property. And Robin effectively keeps the B9 property.
This division of property, Mr. Norcross initially indicated, defendant "sort of agreed" to early on during the negotiations. But defendant was concerned that he was not getting the properties in fee simple and so asked for the Riverdale property. Mr. Norcross' response was negative at that point and he then wanted to begin the Anton trial. According to Mr. Norcross, the following then occurred:
This  Mr. Pio Costa  went back and I was prepared to start the trial. I was suggesting to Robin strongly, strongly, that we start the trial. And that we terminate the discussions with Bill, with Bill Louffer and Tony. Eileen was ready to go. I think she was chomping at the bit in fact. We wanted to start to try it. I came back in the courtroom and our conversation was essentially like that. Like okay, let's get the trial ready. You know, Robin, you're going on the witness stand, blah, blah, blah. We're getting ready. Bill comes in and said, Ken, come out here. They wanted to make another proposal.
This proposal consisted of a list of nine points. Mr. Norcross discussed them with plaintiff. He told her "I really thought that you know, we thought  should just terminate the discussions with Tony. We weren't getting any  just wasn't worth it. What I thought she had given far too much.... [W]e were very confident that would be successful in trial. We were *585 prepared. And I told her we just should just get it going." She was willing, however, to respond to the nine points.
Mr. Norcross discussed with defendant and Mr. Laufer plaintiff's position on the proposal; some of the points she conceded, others she did not. He again suggested they start the trial. Mr. Norcross testified, however, that:
Tony said  he said no, no. He says, you said something different. I think we can do something here. Then we went through the list [sic].
....
I started going through my list. Said, let's forget about the $50,000. He said the limited indemnity was fine with him. He said he would not pay the $2 million. Therefore, the limited indemnity would kick in after he had incurred $2 million of cost. He said the split of the property and in accordance with the schedule was acceptable.
....
Specifically where the Riverdale property would go  go in to Robin. He affirmed the $300,000 payment to Robin would be paid right  first refusal of  was acceptable. He said he still wanted to have a permanent easement. The construction yard. He said the description on the sides was acceptable. And he  the split of the Riverdale proceeds was acceptable. He said. But, let he make something clear he said. When I say the split of the Riverdale proceeds, I also mean that if the State of New Jersey gives  gives an easement to permit, so that the  the sanding and gravel on the Riverdale property can be mine that I want 50 percent of the property  profits from that mining activity. Now, apparently, when 287 was put in, cut off this piece of the Riverdale property, so that you hit  didn't have I guess, an ingress  ingress sufficient for industrial vehicles which were required in order to mine the sanding and gravel. That's on that property. So, it's if an easement could be obtained through the State of New Jersey, the condemnation proceeds, he felt that he should also get 50 percent of the profits from the mining and sanding gravel on the Riverdale property. I went back into the courtroom.
He discussed defendant's additional demands with plaintiff, and again recommended they begin the trial. Mr. Laufer came into the courtroom and:
[H]e asked me to come out. And we stood right outside the door and he said Ken, you know, we're really only apart on the construction yard and the profits of the Riverdale mining activity. And, you know, I sort of acknowledged that. And he said, I tell you what, I says, Tony will take five years on the construction yard and 50 percent on the profits and we can put this  we get this done. I said, I said, well, I'll go talk to Robin. I went inside and Robin said go out and find out if there's anything else. And I can  I remember getting right up and going right out, because I should have thought to ask if there was anything else. So, I went right out in the hall. They were down *586 here at the end of the hall. Bob Smith was sitting on that bench. That's against  of the back of the wall. Tony was sitting on that, on the bench. I believe Bill was sort of standing in the middle. When I came out, I said, is there anything else? Tony stood up, says, no. And  and Bill Louffer goes  goes to Tony, anything Tony? Anything at all? Like that. Tony says no, no, nothing. That's it. So, I said, fine. I came back into  into the room and we started talking about the  about the  those last two issues.
Further negotiations occurred over these "last two issues" without agreement  Mr. Laufer told Mr. Norcross that "it's going to have to be five years and 50 percent."
It was then close to four o'clock. Plaintiff's attorney, in preparation for commencing the trial, requested that the trial judge hear a preliminary motion. He told the attorneys he would hear the motion the next morning before the trial started. The following then occurred:
Bill, Bill Louffer [sic] was then getting ready to  to leave. He said, you guys change your mind, give me a call. Just the last two issues, he said. You know, start of trying to settle the settlement to  to Robin. Says it's just these last two issues. Not that big of a deal. If you look at everything, if you change your mind, give me a call. I live in Chester. My name is in the book.
After defendant and his attorneys left the court house, plaintiff and her attorneys remained and continued the discussion:
Robin and Michael and Eileen and I sat and we talked and we talked about where we had been, where we were going and how things looked. We just talked for a while. Talked about this issue. We were  we  we were saying, you know, really think we can win in the litigation. You can call it off. We'll be  we'll be here tomorrow. Let's litigate it. We can go. Robin was saying no, it's been a long time. This will settle. Everything  we can call put it away. She and Michael talked for some period of time and she was saying, well, maybe we'll take four years at which time I said, no, Robin. If you're going to do it, just do it. Just give him the point. Give him  him five years, 50 percent, if you can accept the fact that he's, you know, in your affairs. Likewise then, just take it, just take it. Then she said, well, we will see if he'll pay rent. I said what kind of rent would be appropriate? She said $3,000 a month. I said, I'll ask. So, she told me to call Bill Louffer [sic], say that we  we would accept Tony's final two points.
She thus agreed on the final remaining issues.
Mr. Norcross was not immediately able to reach Mr. Laufer to tell him that plaintiff had agreed. Later that night he did speak to him at his house:

*587 I can't remember if he called me back or if I called him back, to tell the truth. I can't remember that particular detail, but we conducted again, late that evening I said, that Robin was willing to give Tony his last two  last two points. And I wanted to clarify that. I made it clear that we  we were talking about 50 percent of the profits. Talking about five years on the construction yard, talking about the very limited indemnity. I said, but, Robin, this, you know, you know, I guess I expressed my view that the equities of this, the  really, favor Tony quite a bit. I said, you know, that we thought that Tony should pay rent for the construction yard and I suggested $3,000 a month. He said fine. He will call Tony, give  get back to me. He called me back a relatively short time later and said everything is fine with Tony, but he's not going to pay the rent. I said, that's fine. Then he said what do we do about Simon, because we have the trial scheduled the next day. And I said, I'll call  I'll tell Eileen to give Judge Simon a call early in the morning and tell him that we've got a settlement. We're going to  we're going to go to Pitney to put the documents together and then I said, we'll be at Pitney at nine o'clock. He asked could it be 9:30. I said that would be fine. He said he had something to do. I said that would be fine.
Consistent with this telephone conversation, the trial court was advised the next morning that a global settlement had been reached and that the Anton case was, thus, settled. It was so marked on the trial list. Critically, Mr. Norcross adamantly denied that at any point during January 22 had defendant or his attorneys ever indicated the settlement was contingent on Mr. Richards' approval or that the meeting scheduled the next day, January 23, was for anything other than to finalize and effectuate the necessary settlement documents. Neither did, according to Mr. Norcross, defendant ever indicate that the last two items plaintiff finally conceded, were only preliminary to continuing negotiations.
To be sure, defendant's and Mr. Laufer's testimony told a different story. Although defendant stated to the contrary in his certification filed in opposition to plaintiff's motion to enforce the settlement, he admitted during the enforcement hearing that in fact he had agreed to a division of the various properties and business interests. It was his testimony then, however, that that division was only a theory of settlement, subject to "the mechanics." According to defendant, the negotiations were always contingent upon Mr. Richards' review, as well as his mother's agreement. As to the latter, however, *588 Rosalind's attorney, who had been kept advised of the negotiations, testified that on January 23 Rosalind was prepared to and would have signed the necessary documents effectuating the settlement.
Defendant also said that when Mr. Norcross asked him at the end of the day whether the two remaining issues were the last items of contention, defendant had insisted that all the other items they had discussed were still open. And Mr. Laufer described this final confrontation in the following manner:
Q. Mr. Norcross had come out to the hall where you and your client were, and had asked you earlier in the afternoon whether those two issues were the last two issues, didn't he?
A. Who had come out?
Q. I'm sorry, Mr. Norcross?
A. Yes, he did.
Q. He said to  or words to the substance: Robin wants to know are these the last two issues  is that  isn't that what he said?
A. That's right.
Q. And you then turned to your client, and said: Is that it?
A. That's right.
Q. And he said, yes, did he not?
A. He did not.
Q. Well, what do you say he said?
A. He said those were the two issues he had to deal with, and he said all of the other issues we have not discussed today, and which he's been discussing from day one had to be resolved with the input from Mr. Richards, and there were many of which we didn't even  we did not even talk about.
Q. So if I understand 
A. Because I wasn't even aware of them at the time.
Q. Forgive me. So if I understand the scenario, Mr. Norcross says: Is that it? And you turned to your client, and say: Is that it, Tony, is that correct  I've got it right so far?
A. That's correct.
Q. And now, Mr. Pio Costa says to you: Well, that's it, except for all the issues we have been talking about from time in memorial that Don Richards may raise?
A. Which we raised out [in] the hallway all afternoon in the presence of Mr. Norcross these other issues that I could not deal with that I did not have the expertise to deal with.
Q. What did Mr. Norcross say after Mr. Pio Costa said what you say he said?
A. Mr. Norcross' position was we were going to meet at the office, and draft documents, and that Mr. Richards was going to have input with him in drafting *589 these documents. They would work out the terminology  they would work out the scope of the ECRA  they would work out these other issues.
Mr. Laufer's version of the telephone conversation with Mr. Norcross later that evening was also different from that of Mr. Norcross:
Q. Could you give the Court the benefit of your recollection of the substance of the conversation with Mr. Norcross?
A. He told me at that time that his client was willing to let Mr. Pio Costa utilize the construction yard for five years, but she wanted rent in the amount of $3,000 per month, and she would agree to 50 percent of the mineral rights, and sand or gravel from the Riverdale property.
Q. Now, after Mr. Norcross told you that on the telephone, what did you do?
A. I called Mr. Pio Costa, my client.
Q. And 
A. I advised him of their proposal, and he said he basically told me  well, in uncertain terms, but basically told me "no deal," he says I'm not paying rent and I want a 1.50 a yard for the Riverdale property. I called back Mr. Norcross, I told him that he did not have a deal, that those matters were not resolved. I said, however, we have come a long way in this matter, we resolved a lot of issues, and I suggested we continue our negotiations at which time I would bring Don Richards in, and we might be able to resolve the remaining issues in this case, and have him do areview [sic] of all of the things we already discussed. He indicated to me he also though we had come a long way, and he was also willing to continue with the negotiations. It was recommended at that time that we meet at the Pitney office because of the fact we had all of facilities there, we could have documents there, we could have whatever other  whatever items we need there as opposed to standing out in the hallway in this courthouse to continue with our negotiations. He also told me at that time, he would have Elieen Lindsay contact the Court the first thing in the morning to advise them that we were continuing with our negotiations and that's what 
Q. Settlement negotiations?
A. Settlement negotiations. And I relied upon that.
THE COURT: Who said that?
THE WITNESS: Ken Norcross.
THE COURT: Said what?
THE WITNESS: He told me that Eileen Lindsay would call the Court the first thing in the morning and advise the Court we were continuing our settlement negotiations at the Pitney office.
The call, plainly, for the trial judge was one of credibility. He resolved that in favor of plaintiff. He simply did not believe defendant and Mr. Laufer that a settlement was contingent on Mr. Richards' review, did not believe that the last two items conceded by plaintiff were meant only to be the beginning and *590 specifically found that defendant, in fact, had negotiated and agreed to a global settlement. In doing so, the trial judge observed:
my impression of Mr. Pio Costa is that he is a very well-versed, sophisticated businessman, he didn't need Mr. Richards to espouse his opposition to any proposition which would deny him fee simple, and yet he agreed to something contrary to  based on other considerations  he didn't need Mr. Richards to decide those so-called last two issues concerning the construction yard, and the mining rights, or any rent accruing therefrom, he made that determination himself. He didn't need Mr. Richards to advise him of the problems involving ECRA, he had raised the problems many times before. And he was aware of the risk one way or the other, and he was aware that no matter what happened, there was the distinct possibility that ECRA was going to be a factor in these proceedings, and the matter was addressed and that it was addressed in the form of indemnification.
Now, maybe on sober reflection as he went home the night of the 22nd, he decided that indemnification did not go far enough, and so expressed himself the next day, but that begs the question. The question is whether or not on the day in question, Mr. Pio Costa agreed to certain things, and I'm satisfied that he did, and I will go through the record so that the final record will indicate my findings in that regard, and I make these observations generally that in my opinion Mr. Pio Costa was entirely capable of negotiating and he did.
And, further, he stated:
Now, Pio Costa  Mr. Pio Costa can't say that the details of the proposed global settlement were not, in fact, in Richards hands as of November 19th, 1990, as demonstrated in the Exhibit P-2 in evidence. Of course, Mr. Richards responded, and he raised the question as to the concern about ECRA, and it was a legitimate concern, but having been aware of that concern, and Mr. Pio Costa above all knew what the concerns were, he would continue to negotiate. He, Mr. Pio Costa, negotiated with defense  with plaintiff's counsel with regard to the indemnification issues. Certainly, there was plenty of time for Mr. Richards input and raising of questions concerning the proposed settlement in the interim.
Again, what is probably? I find that it is not probable that Robin would have yielded on the so-called last two issues believing that she had a settlement, if it was potentially intended as stated by Tony that those two items had to be decided before he would negotiate all other issues. It was almost as if Tony Pio Costa testified to that as an afterthought to explain away the issue of the last two issues. I was totally unimpressed by his explanation. It is illogical in the context of the whole proceedings. When was this settlement going to be negotiated considering the fact that if they didn't settle it that day, they were going to trial the next day, and I hasten to assure Mr. Whitmer and anybody else in this, wondering about the question of how the Court would react to counsel presenting a suggestion of continued negotiations away from the Court? I can assure you, and not retrospective, that I would have denied out-of-hand, *591 I have had it with the parties insofar as pending the time with cure  I was prepared to go to trial. So again, the problem is that there was a final concession  Robin didn't have to concede on those points, except I accepted it as reasonable and probable that she thought that she had a settlement.
Now, those are the probabilities.
I noted that nowhere in Mr. Laufer's certification or Mr. Pio Costa's is there any reference to the need to complete a settlement without an agreement by Rosalind. I'm aware that Rosalind may be heavily implicated in this case, and that's why I raised the question with Mr. Whitmer, and I'm also satisfied that even after the fact the Rosalind is willing to sign an agreement if papers are presented to her....
As to the specifics of the terms of the settlement, the trial judge made extensive, detailed findings of facts. Defendant's primary contention on appeal is that all he agreed to were the broad parameters of a settlement, leaving substantial and significant terms still to be resolved, and that such broad parameters cannot form the basis for a judicially enforceable agreement. Kupper v. Barger, 33 N.J. Super. 491, 495, 111 A.2d 73 (App.Div. 1955) (an agreement that establishes a conciliatory basis and foundation upon which to agree constitutes "the vine but not all the branches...." and thus provides an insufficient basis for enforcement).
We have no disagreement with that general proposition. But we disagree that that was all that was agreed to and that that was all the trial judge found. We think the extensive portions of the trial testimony of Mr. Norcross which we have set forth, and which were accepted by the trial judge, fully reflects that. Moreover, the in-depth factual findings of the trial judge readily disposes of this contention. We thus set forth those findings verbatim:
With regard to the findings of fact, I'm satisfied that during the course of the day, as indicated in Mr. Norcross' certification, that a number of settlement proposals were decided, essentially involving the distribution of the various properties by Anton to Tony or to Robin. At that time, Tony rejected the proposals. Now, he was concerned with the potential application of ECRA to various settlement proposals. Understandability. Particularly I find that they  as testified to, and as indicated in the certification, that any transaction involving the transfer of title of an improved property would require compliance with ECRA with respect to that property.

*592 Now, I'm not making that determination, I'm satisfied that they discussed it. I'm also satisfied that they indicated that the cost of the compliance could not be determined at that time, and it was then that Tony without help or need of help by Mr. Richards, demanded Robin indemnify him for the full cost of the complying with any ECRA requirements. Robin's response was to offer to indemnify him for the ECRA costs incurred in excess of one million dollars if B-11, B-14 and B-9 properties or B-11, 14 and 7 were distributed to her. Tony rejected that offer and demanded a full indemnity. Again, only to demonstrate that there was no forbearance with regard to the discussing of very significant aspects on the predicate that Mr. Richards had to be a party to them. I find Tony was advised as well as Mr. Laufer, that Robin would not offer full indemnity. Then, discussions ensued about a modification of the global settlement which might have perhaps eliminated potential ECRA liabilities and the global settlement involved the transfer of Title B-10 to Robin and B-9 to Tony.
So it was recognized that compliance with ECRA with respect to the transfers of those two properties would probably be required. And I find as testified to, that a week before the scheduled trial, that the plaintiff offered to modify the global settlement and substitute the B-9 and B-10 properties. That Tony through Windbeam would retain B-10, and Robin through Anton would retain B-9, and that therefore it was suggested or thought that this so-called modified global settlement would not involve transfer of title to any of the improved properties, that there might have been some reasonable basis for concluding that compliance with ECRA would not be required, and then I find as presented by Norcross, that settlement discussions focused on the so-called modified global settlement. Again, no indication as I find it that Richards had to be privy to this. I find that a copy of the computer spread sheets referred to repeatedly as Exhibit J were presented to Tony. Mr. Norcross says it would be at his request  whether at his request or offered is immaterial; but, in fact, the spread sheet was the same form as the computer spread sheet that had been prepared by Mr. Norcross and given to all of the parties at hand. The suggestion that suddenly Mr. Pio Costa was confronted with a maze of numbers and evaluations, I reject, and I accept the testimony that in fact it had been provided except that the spread sheet eliminated B-10 from the transaction, and gave Robin B-9 and the Mansfield properties. The point is  these did not just suddenly come out of the blue as numbers to conjure with and decided at the last second. There had been an ample opportunity, as I find it, for some sober reflection as what contained in the matters that had been previously provided, and which apparently had been either dropped under the table, placed in a round file, or whatever  but they were in the possession of the defendant.
Now, we come to a situation of the fee simple question because I would consider that to be a significant issue which would have to be resolved. And again, I find that Tony objected initially to the modified global settlement because, as he thought it, that Robin because of Anton would only fee simple to her properties where he would only be the master lessee of his properties. Now, there was some discussion in that regard, and Mr. Norcross tried to point out to Tony that he would also control Pio Costa Enterprises, PCE, the master lessor of his properties, and then Tony demanded that he receive both the *593 Montville and Riverdale vacant properties, and there was some discussion that for years Robin had insisted that Montville and Riverdale go to different parties. That they were perceived by Robin, at least, to be the most valuable of the vacant properties, and Tony wanted Montville and Robin wanted Riverdale.
Again, I find because this discussion went on all afternoon, that the mechanics of the transaction of the so-called modified global settlement were discussed. And that documents could be prepared to effectuate the intent and the settlement of the issues involved. I find that as testified to, that there was considerable discussion, and that Tony in fact accepted the division of the properties as portrayed on the computer spread sheet and concept of the modified global settlement.
And then, Tony wanted additional concessions. He wanted to be indemnified for all liabilities relating to ECRA and any of the costs. And he was told that under no circumstances would Robin agree to any such full indemnity, including the ECRA liabilities. There was a knowledge that there was certainly ECRA risks, but there was a discussion that under the circumstances, all of the parties would have to bear their own shares of the risk  meaning that whatever liability attached to either individual, that individual would be responsible and not an uncivilized way of dealing with the situation  nothing esoteric about that. Tony was concerned that the mere following a request for a letter with the LNA, would trigger investigation by DEP; and, therefore, require compliance. This was always a concern and a consideration. In this master settlement that was being worked out, it was implicid [sic] that there might be some ECRA problems, and I'm satisfied that after a lot of talk, Robin agreed to indemnify Tony on a basis less  it was a limited basis. And I find as indicated, that they did talk about this as a direct proximate result for filing of the request for NLA. And only as a result of filing, an investigation was ordered by the DEP, and as a result of that investigation, some contamination was found that would entail ECRA costs, and if the letter of nonapplicability was not granted, and the parties did not complete the transactions, and the DEP required the indemnification to remedy anyway, Robin would indemnify Tony individually for the cost that he individually incurred. And Tony agreed to do that and I so find it as a fact. Then, Tony demanded, again, and he was entitled, I suppose, to try to raise whatever issues he could, and gain for himself whatever advantage he could. That's bargaining  we're talking now about bargaining before the fact. Tony wanted that the original global settlement be changed so that he didn't have to pay two million dollars to equate the values of the parties  respective parties because that had been discussed in terms of the division of the properties; and, again, he argued that he wouldn't receive fee simple in his properties; and, therefore, deminish [sic] values. And as a result of that, I find that Robin agreed that Tony didn't have to pay the two million dollars consideration for his concerns about the fee simple issue, but that the limited indemnity that she was providing him with respect to ECRA liability of Tony would not comply until he had incurred two million dollars of costs and Tony agreed.
Now, I find that it improbable that the discussions would have gone on to that extent, and that suddenly Tony didn't agree, and I find that it improbable *594 that Mr. Norcross would have said that he agreed he doesn't agree because notwithstanding anything else, I was very much impressed by not only the know how of Mr. Norcross, but the probability and credibility of what he was telling the Court that happened that day as I have tried to equate in terms of my finding of probability. After agreeing to that, Tony wanted another concession. He wanted the modified global settlements with regard to the condemnation proceeds which was suppose to be split 50/50. He wanted the condemnation proceeds as to the Montville property paid to him because he apparently had negotiated with Mr. Larry Riskin who was handling the condemnation matters on this, and Robin would get the condemnation proceeds from the Riverdale property and Robin agreed to that change. Another matter of negotiation. Again, Mr. Pio Costa did not need Mr. Richards, he was entirely capable of expressing himself and either agreeing or disagreeing. Either having gotten that far, Tony  and I find that he did this, and I find it's consistent with his conduct in these negotiations. They then wanted to go back again and retread some old ground that he felt that he should be more fully compensated, again, for the fact that he was not getting fee simple. He wanted, again, a full indemnity for his ECRA exposure. That he received Riverdale as well as Montville and Pequannock, and at that point, and I think it would only be natural to respond in that fashion, he was told by Mr. Norcross: Forget it. And he told Mr. Laufer that the trial should start.
Apparently, there were some more discussions between Tony and Mr. Laufer who called Mr. Norcross out of the courtroom, and said that Tony would agree to the modified global settlement if Robin would make the following additional concessions.
And at the risk of spending time to recite all of the nine items listed in small Roman numerals, I'm going to incorporate them as part of the record in this case to the extent that those demands were made, and Robin was confronted with them, and advised by Mr. Norcross that he thought as her attorney she be giving up too much and let the matter go to trial. And it was at this point, and entirely logical, that Robin said: She wanted to settle the case no matter what the lawyers said to her. And so she gave certain instructions to Mr. Laufer with regard to the concessions that would be made to Tony, and they are contained on page 28 and 29, and comprised of some seven Roman numerals in detail which I will incorporate by reference, again, only in interest of not reading them into the record, but they're part of any appendix, and they're identifiable as part of Paragraph 59 and Paragraph 60 of p 2.
Now, apparently Mr. Norcross was not too confident that Mr. Pio Costa would accept those and he indicated to Laufer that the trial start.
Now, it is indicated that Tony said: Wait a minute, we might have a deal, and then Tony made another offer. And since they are not too detailed, I can read them into the record.
One, we should forget about the $50,000 per year.
Two, the limited indemnity would be acceptable. He would not pay the 2,000,000 to reconcile the values. The indemnity would imply after he incurred $2,000,000 of cost.

*595 Three, splits of the properties would be as portrayed on the schedules, that is, Riverdale would, in fact, go to Robin.
Four, a $300,000 payment to Robin would be made.
Five, right of first refusal was acceptable.
Six, he still wanted permanent easement to use the construction yard.
Seven, description of signs was acceptale [sic].
Eight, the split of the Riverdale condemnation proceeds was acceptable. And Tony said that he wanted to clarify the situation with regard to the fifty percent of the condemnation proceeds. That he wanted fifty percent of the actual proceeds paid by the state as to Riverdale, and if the state granted an easement to provide access to the Riverdale property, and thereby permit the mining of sand and gravel from that parcel, he also wanted fifty percent of the profits generated from such mining activities. He said he wouldn't be involved in the operation of the mining bills at all, but that those would be completely controlled by Robin.
The trial judge found plaintiff finally conceded to the two points, the telephone call to Mr. Laufer, as described by Mr. Norcross, occurred and the agreement was struck  an agreement that, as described by Mr. Norcross and found by the trial judge, encompassed much more than just the "vine," but the "branches" as well.
On appeal, defendant argues:
POINT I: THE TRIAL COURT'S FACTUAL FINDING THAT THE PARTIES ORALLY AGREED TO THE BROAD PARAMETERS OF A SETTLEMENT DOES NOT SUPPORT ITS JUDGMENT ENFORCING A PURPORTED WRITTEN SETTLEMENT CONTAINING NUMEROUS MATERIAL TERMS NOT AGREED UPON BY THE PARTIES.
POINT II: EVEN IF THERE HAD BEEN AN ORAL AGREEMENT ON ALL MATERIAL TERMS, IT WOULD NEVERTHELESS BE UNENFORCEABLE UNDER THE STATUTE OF FRAUDS.
We have thoroughly reviewed all of the transcripts, the briefs and appendices and applicable law. The trial judge's factual findings and conclusions are unassailable. Rova Farms Resort, Inc. v. Investors Ins. Co. of America, 65 N.J. 474, 483-84, 323 A.2d 495 (1974). It is, moreover, fundamental that "settlement of litigation ranks high in [the] public policy" of New Jersey. Pascarella v. Bruck, 190 N.J. Super. 118, 125, 462 A.2d 186 (App.Div.), certif. denied, 94 N.J. 600, 468 A.2d 233 (1983); Bistricer v. Bistricer, 231 N.J. Super. 143, 147, 555 A.2d 45 (Ch.Div. 1987). See Department of the Pub. Advocate v. *596 Board of Pub. Util., 206 N.J. Super. 523, 528, 503 A.2d 331 (App.Div. 1985); Jannarone v. W.T. Co., 65 N.J. Super. 472, 476-77, 168 A.2d 72 (App.Div.), certif. denied, 35 N.J. 61, 171 A.2d 147 (1961). Where the parties agree upon the essential terms of a settlement, so that the mechanics can be "fleshed out" in a writing to be thereafter executed, the settlement will be enforced notwithstanding the fact the writing does not materialize because a party later reneges. Bistricer, 231 N.J. Super. at 145, 555 A.2d 45.
As we have indicated, this settlement covered a series of complex and substantial business and property relationships between the parties. The terms were, of necessity, numerous and, to be fully implemented, required effectuation of numerous documents. We reject, however, defendant's claim that all that the trial judge found had been agreed to was simply nothing more than "the broad parameters" of a settlement. The terms he found the parties agreed to were, though complex, clearly the essential terms of the settlement.
Furthermore, the trial judge's rejection of defendant's contention that the agreement was contingent on Mr. Richards' review and approval and that the last two items plaintiff agreed to were not the only remaining items is amply supported by the evidence and his credibility evaluations. And defendant's suggestion that the settlement could not have been agreed to on January 22, 1991 because it was contingent upon his mother's acceptance, is met by her attorney's testimony that Rosalind was prepared to sign the documents needed to effectuate the settlement on January 23, 1991 and had so expressed that view on January 22. Although he did not so clearly state in his oral decision of May 14, 1991, the trial judge clearly did so on August 23, 1991 when he denied the motion for reconsideration. He said at the time:
And thus, Rosalind offered to sign any settlement agreement which protected her level of income. Rosalind's subsequent signature on the documentation of settlement proves, as plaintiff says, that this Court found as a fact, that Rosalind was prepared to settle. When the settlement Tony and Robin agreed *597 to on January 22, 1991 met the condition of Rosalind's offer, the three parties agreed to the binding agreement, the settlement was enforceable, each against the other.
As with his other factual findings and conclusions, the trial judge's findings and conclusion concerning Rosalind's agreement to the January 22, 1991 settlement are amply supported by the record. We will not interfere. Rova Farms, supra.
We reject as well defendant's somewhat belated claim the oral agreement runs afoul of the statute of frauds. This defense was not raised at any point during the trial on the enforcement action. To the contrary, counsel expressly declined to "get into a statute of frauds area." It was not until after entry of the judgment enforcing the agreement and within the context of a motion for reconsideration that that defense was raised. Thus, plaintiff argues that as an affirmative defense, it was waived when defendant failed to raise it in his motion papers and during the four-day enforcement proceedings.
R. 4:5-4 requires that affirmative defenses, such as the statute of frauds, be raised in a responsive pleading. See also R. 4:6-2. Motion papers, however ordinarily are not considered pleadings. R. 4:5-1(a). See Plank v. Plank, 241 N.J. Super. 543, 550, 575 A.2d 537 (Law Div. 1990), overruled on other grounds, Cimiluca v. Cimiluca, 245 N.J. Super. 149, 152, 584 A.2d 823 (App.Div. 1990). If otherwise timely raised, the strictures of the pleading requirement might not constitute a bar. E.g., Douglas v. Harris, 35 N.J. 270, 281, 173 A.2d 1 (1961) ("the rule requiring a defendant to ... affirmatively plead is mandatory. However, the court may relax that rule when its enforcement would be inconsistent with substantial justice."). Cf. Cimiluca, 245 N.J. Super. at 152, 584 A.2d 823 ("[r]ules of procedure do not exist for their own sake, but as means to an end. They should be construed to secure a just determination, simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay.").
*598 The defense, however, whether raised by pleading or otherwise, must be timely. See Buteas v. Raritan Lodge # 61 F. & A.M., 248 N.J. Super. 351, 363, 591 A.2d 623 (App.Div. 1991); Brown v. Brown, 208 N.J. Super. 372, 384, 506 A.2d 29 (App.Div. 1986). We do not consider defendant's attempt to raise the statute during his motion to reconsider as timely. At no point during the three-day enforcement trial was there a reference to the statute and, indeed, there was a specific rejection of that defense at the time. The failure to alert plaintiff to the defense was not without detriment. Plaintiff argues substantively that forbearance of an immediate trial in the Anton case constitutes sufficient part performance to remove the oral agreement from the statute. Critical to that contention is whether the parties could have on January 23 relisted the matter and obtained an immediate trial date. The record, at best, as to that is meager. Had she known the statute would be raised, that possibility or impossibility, could have been more definitively established during the three-day enforcement proceeding.
Moreover, procedurally, we question whether an affirmative defense not previously raised, can become an issue by simply raising it in a motion for reconsideration. R. 4:49-2 requires such a motion to contain a statement "of the matters or controlling decisions which counsel believes the court has overlooked or as to which it has erred." The basis to such a motion, thus, focuses upon what was before the court in the first instance. D'Atria v. D'Atria, 242 N.J. Super. 392, 401, 576 A.2d 957 (Ch.Div. 1990). The rule was not intended to become the vehicle for new affirmative defenses.
Even had the defense been properly raised, we do think defendant could rely upon it. Concededly, the statute was potentially triggered by the agreement, the transfers and reconfiguration of the parties' various property interests that were required. N.J.S.A. 25:1-5d precludes any action brought *599 upon "[a] contract for sale of real estate, or any interest in or concerning the same...." unless the contract is in writing.
The purpose of such a statute is to prevent "many fraudulent practices which are commonly endeavoured to be upheld by perjury and subornation of perjury." Carlsen v. Carlsen, 49 N.J. Super. 130, 134, 139 A.2d 309 (App.Div. 1958). The concern reflected by the statute is not that agreements within its scope are suspect, but that such agreements are of the type that are susceptible to fraudulent and unreliable methods of proof, thus the necessity for a writing that is signed by the party to be charged. "The primary design ... of the Statute of Frauds is to avoid the hazards attending the use of uncertain, unreliable and perjured oral testimony.... The reason of a law affords the key to its meaning." Moses v. Moses, 140 N.J. Eq. 575, 584, 53 A.2d 805 (E. & A. 1947).
Since, however, the statute is designed to prevent fraud, a court of equity will not permit it to be used to accomplish a fraud. Cauco v. Galante, 6 N.J. 128, 138, 77 A.2d 793 (1951). And so, it has consistently been recognized that part performance of an oral agreement may take the agreement out of the statute of frauds. See e.g., id. at 137-38, 77 A.2d 793; Kufta v. Hughson, 46 N.J. Super. 222, 227-29, 134 A.2d 463 (Ch.Div. 1957). This is so because "[w]here the statute works the intolerable mischief of operating as a fraud the statute should be no bar to the granting of relief to one who has, in good faith, so performed the parol agreement as to irretrievably change the situation of the parties to the disadvantage of the plaintiff." Cauco, 6 N.J. at 138, 77 A.2d 793. See Deutsch v. Budget Rent-A-Car, 213 N.J. Super. 385, 387, 517 A.2d 491 (App.Div. 1986).
Not all performance will trigger the doctrine of part performance. See id. at 388, 517 A.2d 491. Part performance, for instance, must be "clearly referable to the execution of the contract and not to some other relation," Delnero v. Serra, 2 N.J. Super. 350, 352, 63 A.2d 896 (Ch.Div. 1949), and performance *600 of matters that are merely ancillary to an oral agreement, even if costly, are not sufficient, DeMarco v. Estlow, 18 N.J. Super. 30, 34, 86 A.2d 446 (Ch.Div.), aff'd o.b., 21 N.J. Super. 356, 91 A.2d 272 (App.Div. 1952). Even if the performance clearly demonstrates the existence of an oral agreement, the statute cannot be avoided if there has not been a substantial change of position in a degree that cannot be compensable by restitution or damages. Kufta, 46 N.J. Super. at 228, 134 A.2d 463. Thus, part payment of money alone is not sufficient because "[t]he rationale underlying this rule is that while the payment of money may be considered partial performance, the statute of frauds will not be disregarded if the party seeking enforcement of the contract can be restored to his former position by restitution without suffering a significant hardship." Presten v. Sailer, 225 N.J. Super. 178, 194, 542 A.2d 7 (App.Div. 1988). On the other hand, we have found a change of position to a substantial degree such that the statute could not be raised as a bar to an oral six-year lease agreement where the lessee had not only been in possession and paid rent for a substantial period of time but had, as well, expended close to $6,000 for interior renovations. Deutsch, 213 N.J. Super. at 390, 517 A.2d 491.
As found by the trial judge, defendant's conduct both during, at and after the oral agreement on January 22 demonstrated an intent to push his sister as far as he possibly could and extract from her as much as he could before he agreed to settle, leading her to forego her right to litigate and resolve, at the least, the Anton Company partnership. Having succeeded in that, he then immediately attempted to renegotiate for, perhaps, a better deal. We think this conduct, coupled with plaintiff's reliance and part performance by dismissing the case as settled, is such as to render his reliance upon the statute inequitable. Carlsen, 49 N.J. Super. at 138, 139 A.2d 309.
In Carlsen plaintiff waived her right to an immediate trial on her divorce action and a possible favorable judgment based upon defendant's oral promise to convey the marital property in *601 return for a three-month stay of the litigation. She agreed and the trial was stayed, but defendant did not convey the property. Plaintiff was thereafter successful in obtaining an order enforcing the oral agreement. In rejecting defendant's attempt to rely upon the statute of frauds, we said:
we feel the respondent should prevail on the doctrine of equitable fraud. Relying upon appellant's oral promise, respondent changed her position, gave up a possible immediate right to a judgment nisi and cannot practicably be restored. Money damages cannot be ascertained. It would be a virtual fraud to permit the defense of statute of frauds.
[Carlsen, 49 N.J. Super. at 138, 139 A.2d 309].
See also Cauco, 6 N.J. at 138, 77 A.2d 793. See Langford v. Milwaukee Ins. Co., 101 Ga. App. 92, 113 S.E.2d 165, 167-68 (Ct.App. 1960); Sims v. Purcell, 74 Idaho 109, 257 P.2d 242, 244 (1953).
Here, the disputes between the parties had been ongoing for years. The purpose of the Anton litigation, filed in 1987, was to dissolve their respective interests in that partnership and thus, remove at least that source of controversy and tension. As the testimony of Mr. Norcross reflects, plaintiff was confident an order dissolving the partnership would have been obtained had they proceeded to trial as they were fully prepared to do. Defendant, on the one hand, did not appear to be anxious to proceed, perhaps out of concern that dissolution and distribution of the partnership's properties could trigger ECRA as well as some tax implications. Because, above all plaintiff wanted a resolution of all the parties' disputes, not just the Anton matter, a fact defendant most assuredly was aware of, she agreed to the last two items defendant wanted and, though prepared to try her case, advised the trial judge of a settlement, losing the right to an immediate trial.
Defendant contends that her forbearance was not a substantial detriment because both parties sought a relisting of the trial the next day. Because the statute was not raised as a defense during the three-day enforcement proceeding, the record does not clearly focus upon whether the trial could or could not have been readily relisted. But the fact is, plaintiff was not *602 accorded an immediate relisting of the trial. Furthermore, the fact that the trial may have been relisted in the future, cannot recompense her for the continued entanglement with her brother in their respective property and business interests that she thought had ended on January 22, 1991. We do not think the defendant here can any more equitably raise the statute as a bar than could the defendant in Carlsen.
Affirmed.
NOTES
[1] In March 1989, the trial judge disapproved the sale. Defendant appealed and in an opinion filed February 10, 1992, we affirmed. In the Matter of the Estate of Anthony Pio Costa, II, Docket No. A-2869-89T1.