281 N.J. Super. 39 (1995)
656 A.2d 456
ELISE HARRINGTON, PLAINTIFF-RESPONDENT,
v.
KEVIN HARRINGTON, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 28, 1995.
Decided April 20, 1995.
*41 Before Judges PRESSLER, LANDAU and CONLEY.
Noel S. Tonneman argued the cause for appellant (Wilentz, Goldman & Spitzer, attorneys; David M. Wildstein, of counsel; Mr. Wildstein and Ms. Tonneman, on the brief).
Bruce H. Nagel argued the cause for respondent (Nagel and Rice, attorneys; Mr. Nagel, of counsel and on the brief).
The opinion of the court was delivered by CONLEY, J.A.D.
These are two consolidated appeals by defendant arising from the trial judge's factual determination, rendered without a plenary hearing, that on May 3, 1993 the parties had reached a binding oral property settlement agreement. As a consequence of that determination, on October 21, 1993 an order was entered directing that the parties' agreement was "hereby enforced", and various other more specific enforcement orders were entered on November 16, 1993, November 24, 1993, January 3, 1994, March 7, 1994 and March 25, 1994. In addition on January 3, 1994, a final judgment of divorce incorporating the unsigned disputed property *42 settlement agreement was entered. Along the way, the trial judge denied defendant's motion for reconsideration, motion to vacate the judgment of divorce pursuant to R. 4:50-1 and to modify the child support and alimony provisions of the alleged agreement pursuant to Lepis v. Lepis, 83 N.J. 139, 416 A.2d 45 (1980), and motion to stay all provisions of the judgment of divorce that required immediate payments. Defendant appeals these various orders and the entry of that part of the final judgment which incorporates the agreement. We reverse and remand for a plenary hearing to determine first whether there was an agreement. If not, all subsequent orders of enforcement must be vacated and the matter listed for trial. If it is determined that there was a binding agreement, then defendant's R. 4:50-1 and Lepis motion should be reconsidered after the filing of current case information statements and a plenary hearing. In the event of such a hearing, further enforcement of the agreement will be governed by the outcome thereof.[1]
Married in 1978, a complaint for divorce was filed in May 1991. The parties have two young children and their married life style was apparently fairly comfortable, funded by the defendant's successful advertising partnership. The financial complexity of *43 the parties' circumstances is not insignificant. The matter was listed for trial on May 3, 1993. Prior thereto, the only settlement effort we are advised of is plaintiff's attorney's statement in his initial certification that he had sent a "letter demand ... outlining our settlement position."
On May 3, 1993, both parties, their attorneys, and defendant's accountant were present and engaged in a settlement conference in the cafeteria of the courthouse for a number of hours. It is without question that substantial progress was made and all parties were optimistic. Whether there was anything more than an agreement to draft a proposed property settlement agreement for the parties to read and, if acceptable, sign, is the critical issue. Most assuredly, as far as we can tell, the parties did not report to the judge or place on the record that a binding agreement had been reached.
The conduct of the attorneys subsequent to May 3, 1993 and up to June 15, 1993 when defendant's then attorney advised that defendant had fired him and would not execute the draft agreement, would suggest not. For instance, although, as pointed out by plaintiff's attorney in his initial certification, defendant's attorney on May 7, 1993 did forward "one-half of certain monies which he had been holding in a trust account ... pursuant to the settlement we had agreed upon," the attorney expressly stated in the May 7, 1993 covering letter "[o]f course, the above payments are made without prejudice and shall be taken into consideration if the Property Settlement Agreement is not finalized by the parties." Moreover, although the parties dispute the materiality of various changes made to the initial proposed written agreement, it is undisputed that the document went through a series of revisions which do not seem insignificant to us. The agreement itself as it went through the revisions was variously referred to as the "proposed" property settlement agreement by defendant's accountant in his May 26, 1993 tax credit letter to defendant's attorney and as the "revised" property settlement agreement in a June 14, 1993 fax from plaintiff's attorney to defendant's attorney.
*44 To be sure, in support of her July 1993 order to show cause seeking enforcement of the agreement, both plaintiff and her attorney filed certifications asserting that an agreement was reached "on virtually every single issue in the case." Counsel's certification outlined only one remaining issue, that concerning the manner of defendant's contribution to a purchase of a new car for plaintiff. As defendant's then attorney's responding certification pointed out, and as the various revisions to the proposed agreement themselves reveal, there were at least two other issues, one relating to termination of alimony in the event plaintiff commenced co-habitation, and one relating to the tax consequences arising from the sale of the marital home.
At the time of plaintiff's order to show cause application, counsel for defendant filed a certification which neither denied nor affirmed the existence of a binding agreement but simply asserted additional outstanding issues. Defendant, however, filed a reply certification in which he adamantly disagreed that the parties had reached a final and binding agreement on May 3. "What was decided was that plaintiff's attorney would draft the proposed settlement agreement documents so that we could see the proposal in print, however, it was never stated that the oral agreement was final and binding ... I understood that the agreement was not binding until signed or put on the record."
If the parties critical disagreement as to the existence of a binding agreement on May 3, 1993 was at all unclear at the time of plaintiff's initial order to show cause, the certification subsequently filed by defendant's former attorney in support of the subsequent R. 4:50-1 application could not be clearer. Because plaintiff has made much of this attorney's initial certification, not so much for what it says but for what it does not say, we set forth verbatim the critical portions of the February 3, 1994 certification:
2. There is no question in my mind that we did not reach an agreement on May 3, 1993. We sat in the cafeteria and talked about a number of issues but never reached an agreement. Many issues were discussed primarily between the attorneys, subject to further discussion. At the end of the day, we agreed that we had progressed to the point where Mr. Nagel could draft a proposed document which *45 was to be forwarded to me, subject to my review and the review of my client and Mr. Nagel's client.
3. All of the discussions regarding equitable distribution which occurred on May 3rd contemplated that Mr. Harrington's business would continue to function as it has in the past. Our discussion relating to support contemplated that Mr. Harrington would continue to receive a yearly bonus which would enable him to pay the plaintiff weekly support.
4. Indeed, although everyone wanted to settle the case, we contemplated the possibility that the case might not be settled. Accordingly, when I forwarded certain funds to Mr. Nagel, I specifically provided that in the event that no property settlement agreement was finalized, the funds would be a credit against Mr. Harrington's obligations. (See Exhibit A to the Certification of Kevin Harrington).
5. On or about May 19, I received a form of agreement from Mr. Nagel. That agreement contained numerous items that were either not discussed or were inconsistent with my notes. As is my usual custom, I noted those areas with circles, questions marks. (See form of agreement with my notes attached to defendant's certification as Exhibit C).
6. The document forwarded by Mr. Nagel to me did not represent a meeting of the minds of the parties.
(i) It failed to include a provision on termination of alimony in the event of cohabitation. Subsequently, Mr. Nagel wanted the terms to be subject to Gayet. These terms were never agreed upon.
(ii) Mr. Nagel's proposed agreement did not accurately reflect our discussions regarding Mr. Harrington supplying a car to his wife.
7. The proposed document contained certain critical items that were never discussed. Specifically, Mr. Nagel provided for $500,000.00 in life insurance for Mrs. Harrington. Secondly, Mr. Nagel provided that Mrs. Harrington would receive one-half of all Mr. Harrington's bonuses received prior to December 1, 1993. Mr. Nagel also provided that certain insurance reimbursements would be paid to Mrs. Harrington.
The proposed agreement requires Mr. Harrington to pay for camp clothing. Mr. Nagel inserted what is essentially an anti Lepis clause in the event that Mrs. Harrington should at any time in the future receive a full-time teaching position. All of these clauses are material to any matrimonial settlement agreement. Yet, none were discussed on May 3 and none were agreed to thereafter.
8. Most important when we left court that day I was optimistic about ultimately reaching a settlement but one was not reached that day. None was reached thereafter.
The initial certifications themselves present a factual dispute as to the fundamental issue in this case. But it is perhaps unfortunate that counsel's initial certification was not then more explicit. Nothing is to be served, however, by ignoring the additional certification. At the least, it provided a basis for defendant's R. *46 4:50-1(f) motion for, if true, it is fairly evident that continued enforcement of an agreement that did not exist would not be equitable or just. Although defendant's R. 4:50-1(f) application was premised in part upon the by then breakup of his business, it also sets forth defendant's continued assertion that there never was a binding agreement.
We have often acknowledged the fundamental principle "that `settlement of litigation ranks high in [the] public policy' of New Jersey." Lahue v. Pio Costa, 263 N.J. Super. 575, 623 A.2d 775 (App.Div.), certif. denied, 134 N.J. 477, 634 A.2d 524 (1993) (quoting Pascarella v. Bruck, 190 N.J. Super. 118, 125, 462 A.2d 186 (App.Div.), certif. denied, 94 N.J. 600, 468 A.2d 233 (1983)). And see Bistricer v. Bistricer, 231 N.J. Super. 143, 147, 555 A.2d 45 (Ch.Div. 1987); Davidson v. Davidson, 194 N.J. Super. 547, 477 A.2d 423 (Ch.Div. 1984). Although it has been remarked that matrimonial agreements "which are fair and just, fall within the category of contracts enforceable in equity", Petersen v. Petersen, 85 N.J. 638, 642, 428 A.2d 1301 (1981), the basic contractual nature of such agreements has "long been recognized." Massar v. Massar, 279 N.J. Super. 89, 93, 652 A.2d 219 (App.Div. 1995). They are enforceable, subject, however, to Lepis and R. 4:50-1 considerations as well as considerations of unconscionability, fraud or overreaching. Ibid. And see Peskin v. Peskin, 271 N.J. Super. 261, 275-76, 638 A.2d 849 (App.Div.), certif. denied, 137 N.J. 165, 644 A.2d 613 (1994); Morris v. Morris, 263 N.J. Super. 237, 241-44, 622 A.2d 909 (App.Div. 1993).
Moreover, to be enforceable, matrimonial agreements, as any other agreements, need not necessarily be reduced to writing or placed on the record. And we recognize that "[w]here the parties agree upon the essential terms of a settlement, so that the mechanics can be `fleshed out' in a writing to be thereafter executed, the settlement will be enforced notwithstanding the fact that the writing does not materialize because a party later reneges." Lahue, supra, 263 N.J. Super. at 596, 623 A.2d 775. But the point is, there must be an agreement as was determined, following *47 a plenary hearing, by the trial judge in Lahue. And see Davidson, supra, 194 N.J. Super. at 549-50, 477 A.2d 423 ("[t]hese negotiations resulted in a settlement of the case, the terms of which were agreed upon by plaintiff and, based upon representations made by defendant's former attorney after a number of telephone conversations with defendant, by defendant. Defendant does not now dispute this." (emphasis added)).
We recognize that not every factual dispute that arises in the context of matrimonial proceedings triggers the need for a plenary hearing. Adler v. Adler, 229 N.J. Super. 496, 500, 552 A.2d 182 (App.Div. 1988). But we have repeatedly emphasized that trial judges cannot resolve material factual disputes upon conflicting affidavits and certifications. E.g. Fusco v. Fusco, 186 N.J. Super. 321, 329, 452 A.2d 681 (App.Div. 1982); Tancredi v. Tancredi, 101 N.J. Super. 259, 262, 244 A.2d 139 (App.Div. 1968).
The most fundamental issue of all here was whether there was an oral agreement on May 3, 1993, with only the mechanics of putting it in writing left for the attorneys. Even without former counsel's February 7, 1994 certification, that issue was clearly factually disputed at the time plaintiff initially moved to enforce by way of an order to show cause.
Accordingly, we remand for a plenary hearing as to that issue. Additionally, we are of the view that even if a binding agreement then existed, defendant is entitled to a plenary hearing on his R. 4:50-1 motion to set aside the equitable distribution portion of the agreement as well as his Lepis motion to modify the alimony and child support provisions. As we have said, in addition to contending that there never was an agreement, defendant asserted the breakup of his partnership as a basis for both. The parties factually dispute both the timing and bona fides of the breakup and the financial consequences upon defendant.
Most assuredly the trial judge was substantially hampered by defendant's failure to file an updated case information statement when he filed his Lepis motion. See Gulya v. Gulya, 251 N.J. Super. *48 250, 253, 597 A.2d 1098 (App.Div. 1991); R. 5:5-4(a). But the disputed property settlement agreement itself expressly recognized the underlying financial premise upon which, at the least, the support provisions were derived. Thus, paragraph one states "[t]he parties acknowledge that the monthly payment is based on the fact that the husband draws a salary of $100,000 and receives a yearly bonus at year end." Moreover, a major portion of the equitable distribution provisions concerned both party's interests in the partnership.
A Lepis application may be based upon substantial change in the supporting spouse's financial circumstances. Lepis, supra, 83 N.J. at 157, 416 A.2d 45. While not every Lepis application requires a plenary hearing, id. at 159, 416 A.2d 45, the continued viability of defendant's business was a critical element of the parties' agreement. Its dissolution raises disputed issues of fact relevant to the Lepis application and presents at least a prima facie showing of a substantial changed circumstance entitling defendant to a hearing on the support and alimony provisions.
We reach this same conclusion as to the equitable distribution provisions. Modification of the equitable distribution provisions of the property settlement agreement here is governed by R. 4:50-1(f). Designed to balance the interests of finality of judgments and judicial efficiency against the interest of equity and fairness, Baumann v. Marinaro, 95 N.J. 380, 392, 471 A.2d 395 (1984), relief from judgments pursuant to R. 4:50-1(f) requires proof of exceptional and compelling circumstances. Id. at 393, 471 A.2d 395. Ordinarily, to establish the right to such relief, it must be shown that enforcement of the order or judgment would be unjust, oppressive or inequitable. Ouagliato v. Bodner, 115 N.J. Super. 133, 138, 278 A.2d 500 (App.Div. 1971). See Schwartzman v. Schwartzman, 248 N.J. Super. 73, 77, 590 A.2d 246 (App. Div.), certif. denied, 126 N.J. 341, 598 A.2d 897 (1991); Rosen v. Rosen, 225 N.J. Super. 33, 35-36, 541 A.2d 716 (App.Div.), certif. denied, 111 N.J. 649, 546 A.2d 558 (1988).
*49 As we understand it, the validity of defendant's business was a fundamental premise of not only the support provisions, but the equitable distribution provisions as well. It is evident that all of the support, alimony and equitable distribution provisions were part of a "unitary scheme." Cf. Melletz v. Melletz, 271 N.J. Super. 359, 368, 638 A.2d 898 (App.Div.), certif. denied, 137 N.J. 307, 645 A.2d 136 (1994); Connor v. Connor, 254 N.J. Super. 591, 602-03, 604 A.2d 158 (App.Div. 1992). Under the circumstances, equity and fairness entitles defendant to at least a plenary hearing on his R. 4:50-1(f) application. But cf. Schwartzman v. Schwartzman, supra, 248 N.J. Super. at 78, 590 A.2d 246 ("[h]ere, the parties anticipated the contingencies of the sale of the business or the defendant's death. The fact that defendant failed to anticipate the failure of the business does not mean that he should not have done so. Clearly, the possibility of the failure of a business over the 20 year period of the payout was a contingency which the defendant could have provided for in the Agreement had he chosen to do so. His lack of foresight is not an exceptional circumstance beyond his control.").
Accordingly, we reverse and remand for further proceedings as we have outlined in our initial paragraph and consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] We reject plaintiff's contentions in Point I of her brief that defendant's appeal should be dismissed because of alleged fraud and improper conduct in connection with her various enforcement applications and defendant's compliance, or lack thereof. See D'Arc v. D'Arc, 175 N.J. Super. 598, 601, 421 A.2d 602 (App.Div.), certif. denied, 85 N.J. 487, 427 A.2d 579 (1980), cert. denied, 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 350 (1981). Whether defendant knew of the enforcement orders and their obligations and whether his noncompliance was willful is disputed. Moreover, we think other remedies are available to penalize any wilful, improper conduct in connection therewith short of denying defendant the right to pursue this appeal. If, as he claims, there never was an oral agreement, then to preclude his right to appeal that claim because of noncompliance with subsequent enforcement orders would not seem to be entirely just. We point out, in this respect, defendant's assertion that of all the prior orders, there remains only the turnover of $30,000 that cannot be effectuated because, defendant contends, plaintiff refuses to execute a necessary consent order. Cf. Sarner v. Sarner, 45 N.J. Super. 216, 222-23, 132 A.2d 28 (App.Div.), certif. denied, 25 N.J. 103, 135 A.2d 59 (1957).