186 N.J. Super. 321 (1982)
452 A.2d 681
DENISE FUSCO, PLAINTIFF-APPELLANT,
v.
LAWRENCE FUSCO, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 5, 1982.
Decided October 20, 1982.
*322 Before Judges MICHELS, PRESSLER and TRAUTWEIN.
Alan G. Cosner argued the cause for appellant.
Robert J. Buckalew argued the cause for respondent (Browne, Buckalew & DeMarrais, attorneys).
The opinion of the court was delivered by PRESSLER, J.A.D.
Plaintiff Denise Fusco appeals from an order entered by the Chancery Division, without oral argument or evidentiary hearing, according her former husband, defendant Lawrence Fusco, bi-weekly visitation with their daughter, then five years old. As defendant presently is serving a 32-year term at the New Jersey State Prison at Rahway for first degree murder, the order requires plaintiff to "produce the infant child, Tiffany, on the second and fourth Sunday of each month at defendant's place of confinement for two hours of visitation with defendant." We reverse and remand for an evidentiary hearing.
The parties were married in 1974. Plaintiff instituted this divorce action on the ground of extreme cruelty in April 1976, just a month prior to the child's birth. An attempted reconciliation failed, and a judgment of divorce was finally entered in May 1979. Custody of the child remained in plaintiff subject to defendant's right to visitation. In the summer of 1979 defendant was arrested on charges of first degree murder and conspiracy to commit murder, and in May 1980, following a jury trial, he was convicted of both charges and sentenced to an aggregate 32-year term. We are advised that the conviction was affirmed on appeal. The murder itself was a brutal one, defendant having waylaid his victim on an interstate highway where he bludgeoned him to death.
The record further shows that from the commencement of defendant's incarceration his parents have attempted not only to maintain their own grandparental relationship with the child but also to keep her father's memory fresh in her mind. She had been told that he was away working at a job in California *323 and she received periodic telephone calls and letters from him. Insofar as appears from the record, she has not yet been told the truth about his absence. Plaintiff, following defendant's incarceration, initially had cooperated with the paternal grandparents in their desire for frequent access to the child, but relations between them broke down in June 1980 as a result of the grandparents having taken it upon themselves, without plaintiff's knowledge or permission, to take the child to Rahway for a visit with her father. The child thought that she had been to California. That is thus far the only time she has seen him since his incarceration.
In December 1980 defendant moved the court for a visitation order requiring the child to be brought to Rahway on a periodic basis. His motion was supported by his own certification attesting to his love for the child, certifications of the grandparents generally critical of plaintiff because of her resistance to physical contact between father and child in the present circumstances, and the certification of his attorney, annexed to which were letters written by five well-wishers of the elder Fuscos, including clerics and local political figures, opining that the child should see her father in prison. In opposition to the motion, plaintiff filed her own certification expressing her fear that taking the child to see her father in prison, subjecting her to the prison environment and exposing her to inevitable premature discovery of the truth about her father, all at the age of 4 1/2, would cause her irreparable psychological and emotional harm and would impair the good adjustment she had made to the father's absence in the interim. The mother also responded to the battle of public opinion commenced by the father by submitting to the court letters from various friends and acquaintances as well as from the director of the child's nursery school opining that the child should not be taken to Rahway for visitation. In addition, she submitted a petition signed by 67 "friends and loved ones of Tiffany Fusco" urging against such visitation.
Based on these papers in support of and opposition to defendant's motion, the judge on his own motion entered an order in *324 December 1980 requiring plaintiff and the child to submit to psychiatric examination at the county mental health facility "for the sole purpose of making a recommendation regarding the nature and extent of visitation to be granted to the defendant, Lawrence Fusco, if any." He further ordered that defendant be examined by a Rahway State Prison psychiatrist, who was then to file a report "regarding his opinion as to the nature and extent of visitation to be granted to defendant."
Prior to the submission of these reports defendant's attorney filed another certification detailing the continuing difficulties between plaintiff and the paternal grandparents and annexing another batch of letters from the grandparents, defendant and a state assemblyman addressing such matters as plaintiff's recalcitrance, defendant's love for the child and defendant's rehabilitation progress.
In the late spring of 1981 the ordered psychiatric reports were filed. The report dealing with plaintiff and the child consisted of a six-page, single-spaced, detailed review and evaluation by Dr. Gerald Meyerhoff, senior county psychiatrist in charge of children's psychiatric services. His report was accompanied by a six-page, single-spaced, detailed social history prepared by a senior psychiatric social worker on the county facility staff. Dr. Meyerhoff's "diagnostic formulation" regarding plaintiff reads in full as follows:
This thirty year old woman faces daily pressures with reference to raising her daughter as a single parent following the imprisonment of her ex-husband for murder. The child saw her father in prison and was involved in phone calls by the paternal grandparents recently, all of which has caused complications in Mrs. Fusco's plan of holding back information from Tiffany "until she's old enough to understand." Mrs. Fusco's nervous, tense and anxious qualities seem substantially related to the crises she experiences in connection with this problem. It is impossible to know about her logic and judgment in marrying someone with a known criminal record; eventually his philandering, abusiveness and assaultiveness was well known to her and was responsible for separation around the time of the "murder." Today she is capable, appropriately reflective and hardly naive. She appears to be a concerned and quite adequate parent.
Following this evaluation, his recommendation regarding the proposed visitation was ambivalent at best and arguably negative. It reads in full as follows:

*325 Mrs. Fusco, under complicated and trying circumstances, is doing a fairly good job in raising Tiffany. She is the custodial parent and there is no suggestion in any of the reports or in the history, that it should be otherwise. Mrs. Fusco, buttressed by friends and family, is attempting to avoid designation of her father to Tiffany, as a criminal and expects to reveal the truth to her only when she is old enough to understand it. Under these circumstances, any involvement with her father, certainly a visit to the prison, but also visitation with the paternal grandparents, has a disastrous effect in Tiffany's life. Since it seems to be the collective desire of the Fusco family to insure that Mr. Fusco's memory as Tiffany's father is impinged on her state of consciousness, this crusade runs exactly countercurrent to the mother's wishes. The result is a kind of emotional anarchy in little Tiffany's life in which she is required to absorb stories, promises and knowledge about her father from the Fuscos and participate in prayers for his reappearance in her life. This is not in the best interests of the child, of course. Prison visits for Tiffany seem contraindicated now and over at least the next four or five years because of the emotional ravages which are inevitable once the elements of a heinous crime of which her father is convicted become known to her. Ideally, the child should be spared this knowledge until she is old enough to comprehend and deal with it. However, it makes no sense to deny Tiffany the physical presence of her father because that is injurious, at the same time the Fuscos buzz around her with stories and inferences which will exalt him!
A report was also submitted by the prison's consulting psychiatrist. A five-sentence report was submitted respecting a December 1980 evaluation, and a four-sentence report was submitted respecting a June 3, 1981 evaluation. The December report, in relevant portion, reads as follows:
He is alert, cooperative. No evidence of psychosis. He has intact insight and fairly good judgment.
He was tearful when talking about his daughter and seems quite emotionally involved and would like to see her.
The June report reads in full as follows:
Further to my earlier evaluation (dated 12/31/80) I have seen Mr. Fusco tonight. He appeared very cooperative and very concerned about the delay in having the right of visitation from his daughter. It is more than apparent that Mr. Fusco is very emotionally involved with his daughter and if arrangements could be made for it, it will have a positive effect on him.
In my opinion, Mr. Fusco is not psychotic, has intact reality testing and I would recommend that he be permitted to see his daughter at least twice a month with staff supervision.
On the basis of the foregoing documentary submissions, without oral argument, without the taking of any testimony, and without findings of fact, the order here appealed from was entered.
*326 This appeal raises serious substantive and procedural issues which are closely intertwined. The substantive question is whether the welfare of this child will be promoted or disserved by visitation with her father under all of these circumstances. While there is no obvious or easy answer to that question, this much at least is clear. Although the father may not have forfeited his parental rights as a result of his heinous crime, nevertheless the answer to the visitation question must be dictated exclusively by concern for the child's best interests and not by the conflicting desires, wishes or sensibilities of the parents and the grandparents. See In re J.S. and C., 129 N.J. Super. 486, 493 (Ch.Div. 1974), aff'd 142 N.J. Super. 499 (App. Div. 1976); Hoy v. Willis, 165 N.J. Super. 265, 271-272 (App.Div. 1978). Cf. M.P. v. S.P., 169 N.J. Super. 425 (App.Div. 1979).
In terms of the child's best interests there are a number of factors to be considered, not the least of which is the general desirability of maintaining and nurturing the paternal relationship between father and child. But there are strong countervailing factors here suggestive of the conclusion that, at least at this point in her young life, the emotional and psychological burden which this little girl will have to sustain in maintaining the paternal relationship by prison visitation will be significantly more damaging to her than whatever benefits to her may flow from prison visits. Aside from the risk of premature knowledge of her father's crime and problems attendant upon the environmental constraints of prison visits, the probable effect of these visits on the maternal relationship is also entitled to consideration. It must be borne in mind that the mother is effectively the only parent the child now has and that the child's continued emotional health is largely dependent on the mother's continued emotional health. The imposition of a recurrent situation which the mother, in all rationality, finds difficult and stressful and which directly affects her ability to function as the sole custodial parent, while not a dispositive factor, is at least one worthy of attention. It is also clear that as the custodial *327 parent, the mother is entitled to have some control over the time when and the manner in which the child will learn the inevitable and devastating truth about the father. That is not only her responsibility but a decision which she is probably most qualified to make. We do not intend to suggest that a father's right to visitation must depend upon the mother's emotional ability to cope with it. But the circumstances here are extraordinary, the mother is attempting the reconstruction of her life and the child's, the child's age puts her at particular risk, and the situation is the result of defendant's own criminal conduct. In these circumstances, the father's rights may have to yield, at least temporarily, in the child's best interests.
We do not intend that the foregoing expressions of our concern be construed as an exhaustive catalogue of factors and concerns which must be taken into account in the making of the ultimate visitation decision. It is our purpose, rather, to underscore that in this case the making of this decision requires the application of a high degree of care, factual exploration, deliberation and sensitivity to personal and family dynamics and motivations. Clearly, whatever is here decided will have an extraordinary capacity to affect this child's life permanently.
These observations bring us to the procedural issue here. This visitation decision obviously should not have been made on the basis of filed documents consisting of self-serving certifications by the parties, conflicting psychiatric reports, and an unseemly and irrelevant barrage of attorney certifications and inadmissible expressions of community sentiment. That it was so made without an evidential basis, without examination and cross-examination of lay and expert witnesses, and without a statement of reasons is untenable in the extreme. As we previously held in Wagner v. Wagner, 165 N.J. Super. 553 (App.Div. 1979), "the matter of visitation is so important, especially during the formative years of a child, that if a plenary hearing will better enable a court to fashion a plan of visitation more commensurate with a child's welfare" a plenary hearing must be required by the court even if the parties have waived it. The Wagner case *328 involved a father's claim that his weekend visitation was being unfairly impinged upon by the children's religious school attendance, an issue of an order of magnitude hardly comparable to the serious visitation problem here.
We are mindful of the calendar problems prevalent in the matrimonial courts and the consequent recent amendments of the court rules governing matrimonial causes, which were designed, at least in part, to expedite disposition of matrimonial causes. See, e.g., "Report of the Supreme Court Committee on Matrimonial Litigation, Supplement to Vol. CVIII," No. 3, N.J.L.J. (1981). But there is nothing in those rules which warrants dispensing with the clearly mandated plenary hearing here. We are aware that R. 1:6-2(b) authorizes the trial judge, in certain classes of cases including matrimonial litigation, to determine in his discretion the mode and manner of disposition of motions and whether they will be orally argued or not. That practice is further defined in matrimonial causes by R. 4:79-11, adopted effective September 1981, which provides that in exercising its discretion pursuant to R. 1:6-2(b) "the court shall ordinarily grant requests for oral argument on substantive and non-routine discovery motions and ordinarily deny requests for oral arguments on calendar and routine discovery motions."
It is our impression, however, based on the matters which have since found their way to our appeal and motion calendars, that the presumption is almost always against oral argument, and we perceive a growing tendency of matrimonial judges to decide all manner of questions, however delicate and however disputed, on the papers. It further appears to us that this tendency has been caused by an unfortunate and counterproductive blurring together of two quite distinct procedures. The rules, R. 1:6-2(b) and 4:79-11, address only the question of oral argument on motions. The scope of those rules extends, therefore, only to those matrimonial motions which are appropriately decided without further evidence. Consequently, all that is intended by those rules is to give the trial judge the option of dispensing with oral argument, subject to the presumptions of *329 R. 4:79-11, when no evidence beyond the motion papers themselves and whatever else is already in the record is necessary to a decision. In short, it is the sole purpose of these rules to dispense with what is regarded as unnecessary or unproductive advocacy. It was never the intention of these rules to dispense with due process altogether by eliminating the necessity of an evidential basis of decision. These rules consequently have absolutely no applicability at all when the matter before the court is not one which can be decided on papers but is rather one which requires findings of facts on properly adduced evidence. In short, if the proper disposition of a matrimonial dispute requires a plenary hearing, the dispute is by definition not subject to disposition on the papers, with or without oral argument. Moreover, disputes implicating the welfare of a child and involving conflicting contentions and opinions of lay and expert affiants must be submitted to a plenary hearing.
We appreciate the current concern for meeting calendar objectives. Those objectives must, however, be pursued consistently with and not counterproductively to the real business of the courts, which is to dispense substantial justice on the merits.
Reversed and remanded for plenary hearing consistent with this opinion.