776 A.2d 233

RICHARD R. LUEDTKE, PLAINTIFF/RESPONDENT, v. KAREN
M. SHOBERT (LUEDTKE), DEFENDANT/APPELLANT.

Superior Court of New Jersey Appellate Division

Argued April 25, 2001—Decided June 20, 2001.

Before Judges KEEFE [1], EICHEN and WEISSBARD.

*Jerome J. Turnbach,* argued the cause for appellant (*Alan J. Cornblatt,* Designated Counsel, of counsel and on the brief; *Mr. Turnbach,* on the brief).

---

[1] Judge Keefe did not participate in oral argument. However, the parties have consented to his participation in the decision.

*Thomas C. McCoy*, argued the cause for respondent (*Woodland, McCoy & Shinn*, attorneys; *Mr. McCoy*, on the brief).

The opinion of the court was delivered by

WEISSBARD, J.A.D.

Defendant Karen Shobert (formerly Luedtke) appeals from a March 27, 2000 order of the Family Part, awarding primary physical custody of her son, Timothy, to his father, plaintiff Richard Luedtke, with visitation rights to defendant, who lives in Oklahoma. The order resulted from a custody hearing on February 8, 2000 at which defendant appeared *pro se*. Because we find serious procedural irregularities in the manner in which the hearing was conducted, we reverse and remand for a new custody hearing.

Plaintiff and defendant were married on December 10, 1988. Timothy, the only child of the marriage, was born on December 31, 1990. In January 1996, defendant left the marital home in Manahawkin and began residing with her mother in Tuckerton. Plaintiff remained in the family home with Timothy. On August 23, 1996, defendant filed for divorce and, on that same day, the parties signed a "Separation and Property Settlement Agreement." The agreement provided that "the parties shall have joint custody of Timothy ... the child living primarily with the husband, subject to liberal visitation rights to the wife and her mother Rachel Warner."

In early July 1997, defendant relocated to Oklahoma with her fiancé who was in the Air Force. Timothy accompanied defendant on this trip and returned with him to New Jersey on July 27, 1997. On August 11, 1997, the trial court entered an order that defendant not remove Timothy from New Jersey. That same month, plaintiff filed for divorce. On August 21, 1997, the court ordered mediation with respect to visitation. Pursuant to that order, a Probation Officer interviewed the parties and prepared a report concerning visitation, recommending that plaintiff retain custody of Timothy, with defendant having the child for six weeks in the

summer and alternating holidays. On September 11, 1997, the trial court awarded sole custody to plaintiff, with defendant having liberal visitation rights. In April 1998, defendant, who had been living in Oklahoma, moved back to New Jersey, and thereafter petitioned the court to allow her to relocate to Oklahoma with Timothy. Pursuant to that request, the court ordered Dr. Michele Rabinowitz, a psychiatrist, to evaluate the parties and prepare a report for the purpose of determining the proper custody arrangement, including whether defendant should be allowed to remove Timothy from New Jersey. Thereafter, plaintiff and defendant agreed on a summer visitation schedule whereby defendant would have Timothy from Wednesday to Saturday of one week, and Thursday to Sunday of the next.

Dr. Rabinowitz issued her report on August 17, 1998, after interviewing Timothy and his parents and reviewing the child's school records. Without detailing the contents of the report, it suffices to say that Dr. Rabinowitz concluded that it was in Timothy's best interest to reside in Oklahoma with defendant.

On January 29, 1999, Mark White, Ph.D., a licensed psychologist retained by plaintiff, also issued a detailed report regarding the proper custody arrangement for Timothy, after having reviewed the child's school records and having interviewed him, his parents and their respective partners, as well as the child of plaintiff's then girlfriend, Christine Rouler. Dr. White concluded that defendant could have primary custody of Timothy provided she remained in New Jersey. However, Dr. White was of the view that custody should be transferred to plaintiff if defendant attempted to relocate to Oklahoma.

Rather than proceed to trial on the custody issue, the parties entered into a Judgment of Divorce (the judgment) on March 15, 1999. With respect to custody, the judgment provided:

1. *Custody.* The parties shall share joint legal custody of the minor child, Timothy Charles Luedtke, born December 31, 1990. The present shared parenting schedule with the minor child attending school in the Township of Stafford, where Plaintiff resides, shall continue. During the summer of 1999, the parties shall equally divide the time spent with the child, and *commencing September 1, 1999, the child shall*

*primarily reside with Wife and attend school in that school district with the express understanding that Defendant shall then reside in Southern Ocean County.* At that time, Plaintiff's parenting time shall consist of three (3) out of every four (4) weekends, from Friday after school through Sunday at 6:00 p.m., every Tuesday night from after school until the child is dropped off at his school or bus stop on Wednesday morning, and Thursday evening from after school until 7:00 p.m. during the week when Plaintiff does not have custodial time the ensuing weekend. In addition, the parties agree that they shall follow and abide by the Court holiday schedule attached hereto. (emphasis supplied)

Notwithstanding the provision in the order, in April 1999, defendant once again decided to move to Oklahoma because she was carrying the child of Mr. Shobert, who she had met in Oklahoma and who lived there. In that same month plaintiff married Christine Rouler. Defendant contacted plaintiff in early June 1999 to discuss visitation. The parties agreed that defendant would be allowed to take Timothy to Oklahoma from July 3 to August 21, 1999, which she did. However, on August 16, 1999, defendant informed plaintiff that she would not return Timothy to New Jersey and that she planned to take legal action in Oklahoma to obtain custody. On August 23, 1999, plaintiff obtained an order from the trial court in New Jersey requiring Timothy's return to this state. On that same day, defendant appeared before a judge in Oklahoma. Following a conference call between the judge and attorneys for both parents, the Oklahoma court declined to exercise jurisdiction over the matter. Thereafter, plaintiff flew to Oklahoma to retrieve his son and return him to New Jersey prior to the start of the school year.

On December 10, 1999, defendant filed a motion requesting a hearing, pursuant to *Holder v. Polanski,* 111 *N.J.* 344, 544 *A.*2d 852 (1988), to determine whether she could remove Timothy from New Jersey to Oklahoma. The trial court signed an order on January 3, 2000, scheduling such a hearing for February 8, 2000. The court also ordered that the parties contact Drs. White and Rabinowitz for the purpose of updating their previously issued reports.

On February 8, 2000, the parties appeared for the *Holder* hearing. Plaintiff's attorney immediately requested an adjourn-

ment because he had not yet received Dr. White's updated custody report. Defendant, appearing *pro se* for reasons we will discuss at length hereafter, objected to the adjournment request and stated:

> Yes, I don't have counsel, unfortunately, something happened, but four days notice to this, I traveled 1500 miles for my day in court, your honor, to represent what's in the best interests of my son and I'm further being denied that. It's my fundamental right to be able to sit in this forum right now and argue for relief for my son.

The judge denied the adjournment and ordered the hearing to proceed immediately. We briefly summarize the testimony.

Defendant testified that she currently resided in Oklahoma with Mr. Shobert, whom she had married on September 21, 1999, and with the couple's four-month-old son Richard. Defendant stated that her husband worked for a company that sells medicinal gases and welding supplies to nursing homes and hospitals, and that she worked part-time in the payroll department of a home care agency for the elderly and disabled. She called one witness who testified concerning her observation of Timothy when he visited with defendant's mother, his grandmother.

Plaintiff testified that he was a commercial fisherman, and that his new wife was a school teacher. Plaintiff stated that he was building a new home for his family in a neighborhood where Timothy had many friends, and which was located only two miles from his school. Additionally, plaintiff stated that the new home would be close to members of both his family and defendant's family, who visited with Timothy approximately once per week. Plaintiff's mother and sister also testified.

At the conclusion of the hearing, the court ordered both parties to cooperate in having updated evaluations by Drs. White and Rabinowitz performed. Such evaluations were thereafter conducted without incident. On February 16, 2000, Dr. Rabinowitz issued her supplemental report in which she concluded that defendant should be permitted to move Timothy to Oklahoma. Dr. White issued his supplemental report on February 29, 2000, concluding that Timothy should remain in New Jersey with plaintiff. The reports were both comprehensive but, for purposes of this opinion,

we need not recount their substance in detail. The trial judge also interviewed Timothy with only the judge's law clerk present.

On March 7, 2000, the trial court issued a written opinion in which he concluded that it was in Timothy's best interest for him to remain in New Jersey with his father. In reaching that conclusion, the court analyzed both expert reports but relied on the reports of Dr. White because they "hit[ ] the mark." Accordingly, the court adopted Dr. White's recommendations and made them part of its opinion. On March 27, 2000, the court issued an order which provided for joint legal custody of Timothy, but specified that plaintiff was to retain physical custody of the child. Defendant retained "reasonable and liberal custodial time with Timothy at her residence in Oklahoma." The order stated that the court relied on all of the testimony and reports, but that the findings of Dr. White were "more appropriate."

On June 23, 2000, the court heard oral argument in connection with defendant's motion for reconsideration, which was filed on April 18, 2000. Now represented by counsel, defendant asserted that a rehearing was appropriate because she did not have counsel at the February 8 hearing and did not have the opportunity to examine the expert witnesses. The court denied the motion, but ordered that "defendant shall have leave, on notice, to examine Dr. White and Dr. Rabinowitz, and Rob Levin[2], before this court."

At the outset, we must address the course of events which left defendant unrepresented at the February 8, 2000 hearing. Defendant had been represented by one attorney throughout her divorce, culminating in the judgment of March 15, 1999. By letter of September 22, 1999, that attorney acknowledged receipt of a check from defendant fully settling her outstanding balance and in fact overpaying by $670 which, he stated, would be considered as "a retainer against any additional services to be rendered." He asked defendant to contact him to arrange for a telephone inter-

---

[2] Rob Levin was the probation officer who had previously made an evaluation and recommendation.

view concerning "ongoing problems regarding your former husband and your custody arrangements." He also enclosed a "Contract of Employment" which he asked her to sign and return.[3]

On December 14, 1999, counsel again wrote defendant in Oklahoma advising that he had appeared in court on December 10, 1999 and successfully obtained a court order for a *Holder* hearing to be held on February 8, 2000. He enclosed copies of his proposed court order and letters to Dr. Rabinowitz and to plaintiff's attorney. The order, which was eventually signed on January 3, 2000, provided that each party was to contact their expert for an update of the prior reports. He also enclosed a bill for services rendered which apparently included a request for a retainer for "the custody trial," which he asked defendant to remit "at her earliest convenience." In that letter, he stated that he would contact defendant after the New Year "to prepare for trial." He requested any information she deemed material to the hearing, including the names of additional witnesses, and asked to have defendant's mother contact him to prepare her testimony. On December 29, 1999, counsel forwarded to defendant a notice in lieu of subpoena received from plaintiff's attorney, requesting that she gather the subpoenaed material and forward it to him, and also enclosed a Case Information Statement for defendant to complete. Defendant claims that she forwarded the requested material to her attorney on January 18, 2000, but at the hearing plaintiff's attorney claimed that he never received it.

On January 27, 2000, two weeks before the scheduled hearing, defendant's attorney wrote to her, by regular mail, in Oklahoma, the following:

> I am writing to advise that as a result of your failure to respond to my letter of December 14, 1999, my office will no longer be representing you in these child custody proceedings. Please make arrangements to retain other Counsel and provide my office with his or her name.
>
> Enclosed herewith please find a copy of Mr. McCoy's most recent letter.

---

[3] We have not been provided with a copy of that contract.

No copy of this letter of withdrawal was shown as having been sent to either the court or opposing counsel.

True to his word, counsel did not appear at the February 8, 2000 trial. He did, however, write the court a letter dated February 16, 2000, in justification of his action, apparently having heard that defendant appeared *pro se* at the hearing and made negative comments about him.

In his letter counsel stated that he was "never hired or retained to represent" defendant in the *Holder* hearing and that there remained "a balance due on her bill for prior services rendered." Further on, he explained that the "balance due" was $80, representing a $750 fee for filing the motion which led to the *Holder* hearing, apparently less the $670 overpayment from the final bill. It was counsel's position that defendant had failed to pay his requested retainer for the *Holder* hearing and had failed to otherwise respond to his December 14, 1999 letter. The attorney stated that he had acted "entirely appropriately on Mrs. Shobert's behalf and object[ed] very strongly to any implication otherwise."

Notwithstanding, in our view counsel did not act "entirely appropriately" and, at the very least, did a disservice to the court. First, it appears from the February 8, 2000 record that plaintiff's counsel did not learn from the attorney that he would no longer be representing defendant until February 3, 2000, five days before the hearing. Although the letter of withdrawal was sent to defendant on January 27, 2000 defendant avers that she received it on January 29, 2000. Most importantly, there is no indication on the record that the trial judge was aware in advance that the attorney had withdrawn and that defendant would be appearing *pro se*.

Rule 5:3–5(d) provides that after the fixing of a trial date, or prior to the fixing of such date where the client does not consent, "an attorney may withdraw from the action only by leave of court on motion on notice to all parties." The rule goes on to outline the matters the court should consider in deciding the motion. The reasons for the rule are obvious and we deem them applicable

here. Although this was a post-judgment matter, it involved a discrete hearing, certainly akin to a trial for our purposes, as to which a date certain had been fixed. It is clear that the court had set aside the day for this hearing. As a result, the court and opposing counsel, as well as the defendant, were left "high and dry." It appears that defendant did sign the retainer agreement sent by counsel on September 22, 1999 and, as of his December 14, 1999 letter, counsel stated that he considered that agreement "to be still in effect." Defendant certified to the trial court, on her motion for reconsideration, that she had no inkling that the attorney would not represent her, up to the time she received his letter on January 29, 2000, ten days before the hearing and even fewer days before she was due to leave for New Jersey with a pre-purchased airline ticket.

While we do not suggest that an appearance in the early stages of a matrimonial case obligates an attorney to pursue post-judgment litigation unless relieved by the court, that is not the situation here. Defendant's attorney had substantially involved himself in this particular aspect of the litigation and had participated in setting a trial date with the court and opposing counsel. His unilateral withdrawal under these circumstances cannot be condoned. Indeed, had he moved to withdraw there is reason to believe that the court might have denied the application under the *R.* 5:3–5(d) criteria: the past history of the client meeting her financial obligations, with the resulting likelihood that he would "receive payment of any balance due under the retainer agreement if the matter [were] tried"; the minimal burden on the attorney for this one day trial; and, most significantly, "the prejudice to the client or to any other party." The fact that plaintiff's counsel also sought an adjournment does not change our view of the matter. The attorney's failure to comply with the court rule substantially contributes to the need for a new hearing in this sensitive matter.

We now turn to the hearing itself. The trial court was obviously, and rightly, upset that he had reserved the day for this case.

"I have people fighting to come and get before me and this is your day. This has been set aside since ... for months now waiting to hear this case." Although the court referred in passing to defendant's dilemma when he noted, in obvious reference to her former attorney, "he sent her a letter at the end of the month when he had notice a month before," the court made no further inquiry into the circumstances of counsel's failure to appear nor was any consideration apparently given to contacting counsel to compel his appearance. To some extent, defendant herself may have unwittingly contributed to the court's desire to dispose of the case by refusing plaintiff's suggested adjournment and pushing for the case to go forward. Nevertheless, the matter was sufficiently important that, at a minimum, a thorough inquiry should have been made concerning defendant's waiver of her right to be represented by counsel.

We cannot lose sight of the fact that a *Holder* hearing, concerning the right of a custodial parent to relocate out of New Jersey, must ultimately focus on the best interest of the child. *Holder, supra,* 111 *N.J.* at 353–54, 544 *A.*2d 852. *See also Levine v. Bacon,* 152 *N.J.* 436, 442, 705 *A.*2d 1204 (1998). In this case that interest was even more pronounced since the hearing would have had the effect of changing the residential custody status of the child. The March 19, 1999 judgment of divorce had provided that Timothy would reside with defendant commencing September 1, 1999 "with the express understanding that Defendant shall then reside in Southern Ocean County." Since defendant moved to Oklahoma, the stated contingency never occurred and Timothy remained with plaintiff. As a result, this was more than just a *Holder* hearing since that case, and its progeny, dealt with the right of a custodial parent to relocate. Here, the non-custodial parent had already relocated and sought residential custody of the child. This simply underscores the significance of what was at stake on February 8, 2000.

Although we share the frustration of the trial judge, faced with the prospect of a "lost" day and the laudable desire to

utilize his time for some good purpose, we conclude that the matter should have been adjourned, despite defendant's protestations. While calendar objectives are not to be lightly disregarded, they must always "be pursued consistently with and not counter productively to the real business of the courts, which is to dispense substantial justice on the merits." *Fusco v. Fusco,* 186 *N.J.Super.* 321, 329, 452 *A.*2d 681 (App.Div.1982). Although there might have been some fault on defendant's part, for not staying in closer contact with her attorney, even if she were blameless the child's best interest was not served by permitting her to appear without counsel under those circumstances. This is not to say that a party may not knowingly and intelligently decide to appear *pro se.* Even in the criminal arena, where the right to counsel is constitutionally grounded, a defendant may choose self-representation. *See Faretta v. California,* 422 *U.S.* 806, 95 *S.Ct.* 2525, 45 *L.Ed.*2d 562 (1975). However, where, as here, a party is seeking relief which will impact upon a child, who has no independent representation, the court should seldom, if ever, proceed without both parents being represented, or, if they choose not to be, then being entirely satisfied that the child's interests are being adequately protected. Obviously, the child's best interest cannot be waived by the parents. *Cf. Martinetti v. Hickman,* 261 *N.J.Super.* 508, 512, 619 *A.*2d 599 (App.Div.1993) (because of the State's *parens patriae* interest in assuming a proper level of support for all children, the right to child support cannot be waived by the custodial parent). The court has the power, if necessary, to appoint counsel, *R.* 5:8A, or a guardian *ad litem, R.* 5:8B, for the child.

We are not confident that Timothy's best interests were adequately protected in this case. Although defendant testified and produced one witness, both were subjected to extensive and professional cross-examination by plaintiff's counsel, whereas defendant did not cross-examine plaintiff or his witnesses at all.[4]

---

[4] On a number of occasions, plaintiff's attorney objected to and moved to strike answers given by defendant on cross-examination. The court never specifically

"Palpably, she was unable to match the ability of a competent attorney to expose weaknesses in the opponent's case and present her own case in the most favorable light." *In the Matter of Patricia L. v. Steven L.*, 119 *A.D.*2d 221, 506 *N.Y.S.2d* 198, 200 (App.Div.1986).

■ Unfortunately, the unfairness in the hearing carried through to the post-hearing developments. The parties were directed to, and did, contact the respective experts for updates of their rather stale reports. As noted, Dr. Rabinowitz's supplemental report was received by the court on February 22, 2000, while Dr. White's report arrived on March 2, 2000. However, the reports came directly to the court and were never provided to the parties. As a result, the parties were never given the opportunity to seek to have the experts brought to court for cross-examination prior to receiving the court's letter opinion of March 7, 2000, only five days after the receipt of the last expert's update. In that opinion, the court decided to rely upon Dr. White's recommendation over that of Dr. Rabinowitz. Indeed, insofar as the opinion reveals, the court was not moved by anything that had been elicited at the February 8 hearing. In its order of March 27, 2000, the court specifically found "that the analysis of Dr. White in his report is more appropriate in this difficult matter." However, neither party, particularly defendant whose expert's opinion was not followed, had the opportunity to cross-examine the experts, a point that was made by defendant's new attorney when she sought reconsideration of the March 27, 2000 order.

■ Generally, it is improper for a court to decide a case in reliance on an expert opinion without allowing the parties to examine the expert. *See P.T. v. M.S.*, 325 *N.J.Super.* 193, 214, 738 *A.*2d 385 (App.Div.1999); *W.W. v. I.M.*, 231 *N.J.Super.* 495, 525–26, 555 *A.*2d 1149 (App.Div.1989)(Skillman, J., dissenting),

---

ruled on these matters and generally took a limited role in the hearing, asking only a few questions. In at least one instance, defendant was subjected to demeaning and arguably objectionable questioning concerning her personal life, questioning which likely would have been objected to if she were represented.

*appeal dismissed* 121 *N.J.* 630, 583 *A.*2d 326 (1990); *Fusco v. Fusco, supra,* 186 *N.J.Super.* at 327, 452 *A.*2d 681.

In *In re Guardianship of J.C.,* 245 *N.J.Super.* 373, 585 *A.*2d 965 (App.Div.1991), *aff'd,* 129 *N.J.* 1, 608 *A.*2d 1312 (1992), in reliance on a post-trial bonding report, the trial court issued an order terminating parental rights. This court concluded that it was improper for the trial court to issue its order without giving the parent the right to examine the expert that prepared the report. *Id.* at 375–76, 585 *A.*2d 965. Indeed, in that case, as here, the parties had not even seen the report before the court issued its decision in reliance upon it. Accordingly, this court remanded the matter to allow the parent to examine the expert and offer evidence to rebut the expert's opinion. *Id.* at 377, 585 *A.*2d 965.

■ Clearly, the right to cross-examine expert witnesses is of central importance in custody matters. Indeed, the right of cross-examination is a critical component of the adversary system. *Miller v. Henderson,* 41 *N.J.Super.* 15, 25, 124 *A.*2d 23 (App.Div. 1956) ("cross-examination is the most effective device known to our trial procedure for seeking the truth"). Even court appointed experts are subject to cross-examination before their findings may be admitted into evidence. *R.* 5:3–3(f). Plaintiff does not dispute the importance of this right. Indeed, plaintiff commendably concedes that "understanding, and possibly challenging, an expert's opinion and its bases, particularly when adversarial to one's position, is vital to our system of justice and fair play." Plaintiff argues, however, that defendant waived her right to cross-examine the experts, particularly Dr. White who prepared the report relied on by the judge.

During oral argument of the reconsideration motion, the court seemed concerned about its decision to render an opinion without allowing examination of the experts, stating:

I'll tell you what I'm going to do: I'm not going to give a rehearing, but I will allow Mr. Cornblatt, if he wants, to call one or two of these witnesses that are included in my opinion.

The court then informed defendant's counsel that he should identify which witnesses he wanted to call within five days and

then "bring them down and we'll hear them." In response to defense counsel's request to clarify the order, the trial court stated:

However, since these reports had to be done after the hearing, I will allow you to call any of those witnesses that I relied on in my letter opinion for cross-examination and that's as far as I'll go.

Defense counsel then replied:

I thank you, Your Honor. We will of course be filing an application for appeal immediately, and shall I submit a formal order or do you want a handwritten order as to what happened today?

As we noted earlier, the court's order provided that "defendant shall have leave, on notice, to examine Dr. White and Dr. Rabinowitz, and Rob Levin, before this court."

■ Thus, from the argument and the order, it is clear that the court offered to hold a hearing during which the defendant could examine the experts and challenge any of their conclusions. However, it also appears that defendant opted to file an appeal with this court rather than pursue such a supplemental hearing. Plaintiff relies on this decision in arguing that defendant waived her right to cross-examine Drs. White and Rabinowitz. We disagree.

Defendant's exercise of her right to appeal, rather than going forward with the proposed after-the-fact cross-examination of the experts, cannot fairly be characterized as a waiver of this issue. Defendant could reasonably have concluded that the court was not entirely open-minded on the matter and was not likely to change its opinion based upon such cross-examination many months after the initial decision. We share that assessment. In our view, cross-examination after the trier of fact has already made a decision is not generally likely to be helpful. It tends to place the burden on the "losing" party, in this case defendant, to change the court's mind. Indeed, this seems particularly so in light of the court's statement that it was not actually granting a rehearing, even though it would permit the belated cross-examination.

■ There are further problems with the court's decision. Although Timothy was interviewed by the court after the hearing

with only its law clerk present, the opinion makes no reference to the results of that interview and whether it played any role in the court's decision. Nor was the interview recorded and made available to the parties, as required by *R.* 5:8–6. In addition, the court's opinion did not set out its analysis of the specific factors weighing in favor of Timothy remaining in New Jersey in his father's custody, other than to adopt the "analysis" and "conclusion" of Dr. White. Given the nature of this hearing as one that involved the child's continued custody, and not simply relocation, *N.J.S.A.* 9:2–4f required the court to "specifically place on the record the factors which justify any custody arrangement not agreed to by both parents." In contested cases, the necessity for such a record of the court's reasons is mandatory. *Kinsella v. Kinsella,* 150 *N.J.* 276, 317, 696 *A.*2d 556 (1997). The court, in reaching its decision, must specifically reference the statutory criteria found in *N.J.S.A.* 9:2–4c. *Terry v. Terry,* 270 *N.J.Super.* 105, 119, 636 *A.*2d 579 (App.Div.1994). That was not done here.

Further, since this hearing sought to effect a change in residential custody, the court should have considered the applicability of *R.* 5:8–5 which requires each party to submit a Custody and Parenting Time/Visitation Plan. This was not done or, as far as we can see, even considered.

The matter must, therefore, be remanded for a new hearing. Since it is now well over a year since the experts issued their reports, new evaluations should be conducted, the reports provided to the parties, and of course, cross-examination permitted as of right before any decision is reached. Timothy, who is now more than ten years old, should be re-interviewed by the court. *See Mackowski v. Mackowski,* 317 *N.J.Super.* 8, 12, 721 *A.*2d 12 (App.Div.1998). The court will also now have the benefit of the recent opinion in *Baures v. Lewis,* 167 *N.J.* 91, 770 *A.*2d 214 (2001), to the extent it is helpful on the *Holder* issue. Of course, the first step will be to decide which parent is to have residential custody of Timothy. Depending upon the resolution of that question, the relocation issue may or may not need to be addressed. The hearing should be held promptly and accorded

priority given the length of time it has now been pending and the impact on this child's life.

Finally, we believe it would be best if the matter is heard by a different judge. We recognize the time and effort the court put into the case and we have already acknowledged its justifiable frustration at the dilemma forced upon it by the attorney's unilateral withdrawal and defendant's insistence upon moving ahead. Notwithstanding, we believe it would place the court in an untenable position to now have to reevaluate a case in which it had already expressed a preference for one of the experts over the other. Even if the court could perform the "mental gymnastics" required to set aside its earlier decision, the appearance of justice would be better served if the matter were reassigned. *See P.T. v. M.S.,* 325 *N.J.Super.* 193, 220–21, 738 *A.2d* 385 (App.Div.1999).

Reversed and remanded for a new hearing. We do not retain jurisdiction.