**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2166-20

T.F. and R.F.,

     Plaintiffs-Respondents,

v.

C.G. and L.G.,

     Defendants-Respondents.

_____

M.J.S.,

     Appellant.

_____

          Submitted April 25, 2022 – Decided July 1, 2022

          Before Judges Messano, Enright and Marczyk.

          On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FD-02-0750-14.

          Laterra & Hodge, LLC, attorneys for appellant M.J.S. (Scott Adam Laterra, of counsel and on the brief).

          Peter Van Aulen, attorney for respondents C.G. and L.G.

PER CURIAM

Interested party appellant M.J.S. (Michael) challenges the September 24, 2020 order denying his request for parenting time with his biological son, M.J.S. (Max).[1] Michael also appeals from the March 15, 2021 order denying his motion for reconsideration of the September 24 order. Having reviewed Michael's arguments in light of the record and the applicable principles, we affirm.

I.

Michael is currently serving a forty-five-year sentence for the 2013 strangulation of Max's biological mother, M.G. (Marie). Max, now nine, was eight-months old and present in the home when his mother was killed.

In March 2015, Michael, along with Max's maternal grandparents, C.G. and L.G. (Cate and Lou) and his paternal grandparents, T.F. and R.F. (Tess and Ron), entered into a custody agreement giving each grandparent joint legal custody of Max. The agreement also designated Cate and Lou as Max's "primary parents in residence." Further, the agreement provided, "[a]ll parties to the litigation, [Tess and Ron, Cate and Lou and Michael,] hereby consent to this

---

[1] We identify the parties and child in this matter by initials and pseudonyms to protect the confidentiality of court records relating to child custody. R. 1:38-3(d)(13).

A-2166-20

agreement and all parties reserve all their present and future rights that may exist." Michael and each grandparent signed the agreement. Approximately one week later, the trial court entered an order deeming the custody matter settled pursuant to the terms of the agreement.

On February 5, 2018, both sets of grandparents entered into a consent order, agreeing they were "prohibited from facilitating or allowing any contact whatsoever between [Max] and [Michael]." Although Michael was a party to the matter and received notice of the 2018 proceedings, nothing in the record indicates he filed anything with the court, and he did not sign the consent order.

In May 2020, Michael moved to amend the 2018 order to allow him parenting time and telephone contact with his son; alternatively, he requested a plenary hearing to address these issues. Cate and Lou filed a cross-application opposing Michael's motion, and Tess filed a reply certification in support of Michael's application.

During argument on the cross-applications in September 2020, Michael's attorney claimed that given Max's current age of seven, and his maturation since the entry of prior orders in the case, an expert should be appointed to evaluate what contact, if any, would be appropriate for Michael to have with Max, consistent with the child's best interests. Before argument concluded, the

motion judge asked, "Does this child know the circumstances of what occurred?" Counsel for Cate and Lou answered, "No," whereas Michael's attorney responded he "couldn't answer that." Counsel for Tess and Ron stated Max "was told by . . . the maternal grandparents that a bad man killed his mother," adding, "I don't know if [Max] made that connection, but that was done a couple years ago." The judge reserved decision following argument.

Less than a week later, Tess filed a supplemental certification "on the issue of what [Max] knows about his father." Tess certified Max had been in therapy since he was five, and before therapy ended in September 2019, his therapist penned a story for Max entitled "Chippy," a story loosely "based on [Max's] life" in that it involved a chipmunk family where the chipmunk mother died and the chipmunk father went to prison. According to Tess, during a meeting with all the grandparents at the therapist's office, it was agreed Max's therapist would introduce the "Chippy" story to Max, the grandparents would keep a copy of it at their homes, and Tess would tell Max about his mother's death. Tess certified she later "sat with [Max] and told him the truth that his mother had died and that his dad was in prison for causing her death."

On September 24, 2020, the judge denied Michael's motion, finding it was Michael's "burden to establish grounds for modification" of the February 5, 2018

order and he "ha[d] not proved a sufficient change of circumstances." Additionally, the judge concluded "[t]he facts that [Michael] was not a signatory on the consent order, was not present at the hearing on February []5, 2018, and has not surrendered his parental rights cannot serve to support his claim for parenting time with [Max]." Further, the judge found Michael "cite[d] several courses he completed while incarcerated, including Cage Your Rage and Helping Offenders Parent Effectively, to show he is on the road to rehabilitation," but "any relevant certifications obtained were completed by the father before the entry of the Consent Order in 2018." The judge also stated Michael "was noticed of the hearing which resulted in the Consent Order. Significantly, this Consent Order was entered a mere two and a half years ago."

In denying Michael's motion for contact with Max, the judge further concluded Max

> is currently classified in school as Emotionally Disturbed . . . . The paternal grandparents assert the child has been asking about his father, but the maternal grandparents presented evidence that the paternal grandparents violated the February 5, 2018 Order by permitting phone contact between the minor child and [Michael].

Finding Michael failed to satisfy his burden to warrant modification of the February 2018 consent order, the judge explained

5

the acts of violence which led to the biological mother's death took place in the physical presence of the minor child. Although the child was only two years old at the time, the passage of five years is not a sufficient period of time to reintroduce this man (albeit his father) who violently and permanently deprived the child of the opportunity for a relationship with his biological mother.[2] This realization will be a bitter pill to swallow when the time comes. Today, the [c]ourt simply determines that the time has not come yet.

[Max] has been through four evaluations in a short period of time.[3] Although [Michael] did not participate in those evaluations, it is of import that contact with the biological father is noticeably absent from the evaluations and recommendations contained therein. Given the child's immaturity and fragile emotional state, it is not in the child's best interests to undergo another evaluation at this time, particularly when [Michael] failed to establish changed circumstances.

Michael moved for reconsideration of the September 24 order, renewing his arguments for contact with Max and contending, in part, the judge failed to

---

[2] It appears the judge's references to Max being two years old and the passage of five years are tethered to the entry of the 2015 agreement rather than the year of the murder. As we have mentioned, the murder occurred in October 2013, when Max was eight months old.

[3] The dates of the evaluations, other than the one conducted in April 2019, are not listed in the record. Also, though the judge notes in his September 24, 2020 and March 15, 2021 opinions that Max participated in four expert evaluations, during argument on the reconsideration motion, the judge stated Max had "gone through three evaluations." This discrepancy is of no moment considering it is undisputed Max was subjected to multiple expert evaluations before Michael filed his initial motion in May 2020.

consider Tess's supplemental certification before issuing his order. Max's maternal grandparents opposed the reconsideration motion, again arguing Michael should have no contact with Max. Cate and Lou also objected to Michael's request that Max be evaluated for the specific purpose of addressing whether parental contact was in the child's best interest. On the other hand, Tess and Ron advocated through counsel for Max to be evaluated again, arguing that because he was now eight years old, the child was "old enough to start expressing his feelings to address this issue."

Following argument on February 18, 2021, the judge rendered a decision from the bench, denying the reconsideration motion. The judge initially cited the limited instances when reconsideration is appropriate. After assuring the parties he considered Tess's supplemental certification before issuing his September 24 order, "even though it was . . . submitted after the [September 18, 2020] oral argument," the judge concluded that certification did not lead him to conclude Max "ha[d] a full understanding of what happened that night [of the murder] and the ramifications upon his life."

Additionally, the judge stated Max already had "gone through three evaluations," leading the court to be concerned "about this child's emotional stability and his best interests." The judge reasoned:

A-2166-20

I am not saying . . . the father should have no contact forever. My position is that for purposes of the best interest of the child and what this child has gone through, he does require a bit of a respite and a bit of a development to start to determine for himself what . . . he needs to do with regards to a relationship with his father.

The . . . evidence that . . . [Max] is informed about what has happened with his mother's murder, I don't feel is a full disclosure of what is going on. [Counsel for Cate and Lou] has argued and this court supports that [Chippy] was an abstract story-like telling of what occurred. [Max] is not really aware of the facts that transpired.

I think . . . [Max] does need some therapy and I will direct the parties to cooperate in getting continued therapy. . . . This child is crying out for therapy.

And once . . . he starts to develop, through therapy, he's able to deal with his loss, perhaps the therapist can . . . in the future, not now, . . . make a determination as to what . . . he's mentally and emotionally capable of dealing with going forward.

II.

On appeal, Michael offers the following arguments for our consideration:

> POINT I. - The Court Erred in Finding that a Change of Circumstances Standard Should Be Applied to Appellant's Application; or alternatively, in Failing to Find a Change of Circumstances in the Passage of Time and Age of the Child.
>
> POINT II. - The Court Erred in Declining to Order a Best Interest Evaluation and Hearing.

We are not convinced.

In general, because the Family Part has special expertise in family matters, we defer to factual determinations made by the trial court if they are "supported by adequate, substantial, and credible evidence in the record." Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)). However, we review the Family Part's interpretation of the law de novo. D.W. v. R.W., 212 N.J. 232, 245-46 (2012).

A trial court's decision to deny a motion for reconsideration will be upheld on appeal unless the decision was an abuse of discretion. Granata v. Broderick, 446 N.J. Super. 449, 468 (App. Div. 2016) (citing Fusco v. Bd. of Educ., 349 N.J. Super. 455, 462 (App. Div. 2002)). An abuse of discretion "arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cnty.

9

Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. INS, 779 F.2d 1260, 1265 (7th Cir. 1985)).

Reconsideration is appropriate in two circumstances: (1) when the court's decision is "based upon a palpably incorrect or irrational basis," or (2) when "it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence." Cummings v. Bahr, 295 N.J. Super. 374, 384 (App. Div. 1996) (quoting D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990)).

A decision concerning custody is up to the sound discretion of the Family Part judge. See Randazzo v. Randazzo, 184 N.J. 101, 113 (2005). In any custody or parenting time dispute, "it is well settled that the court's primary consideration is the best interests of the children." Hand v. Hand, 391 N.J. Super. 102, 105 (App. Div. 2007) (citing Kinsella v. Kinsella, 150 N.J. 276, 317 (1997)). Therefore, a parent seeking to modify a parenting time schedule "bear[s] the threshold burden of showing changed circumstances which would affect the welfare of the children." Todd v. Sheridan, 268 N.J. Super. 387, 398 (App. Div. 1993) (citing Sheehan v. Sheehan, 51 N.J. Super. 276, 287 (App. Div. 1958)); see also Lepis v. Lepis, 83 N.J. 139, 157 (1980). Stated differently, a party seeking to change a judgment involving a custodial arrangement bears

the burden of proof to demonstrate the status quo is no longer in a child's best interest.  See Bisbing v. Bisbing, 230 N.J. 309, 322 (2017).

Once a movant makes a prima facie showing of changed circumstances, only then is that party entitled to "a plenary hearing as to disputed material facts regarding the child's best interests, and whether those best interests are served by modification of the existing . . . order." Faucett v. Vasquez, 411 N.J. Super. 108, 111 (App. Div. 2009); see also Lepis, 83 N.J. at 159 (holding "a party must clearly demonstrate the existence of a genuine issue as to a material fact before a hearing is necessary," and noting "[w]ithout such a standard, courts would be obligated to hold hearings on every modification application").

Guided by these principles, we find no support for Michael's contention the judge abused his discretion in denying Michael's motion for contact with his son.  As the record demonstrates, the parties provided the judge with ample submissions detailing Max's personal circumstances, including the fact that by age seven, the child had participated in multiple evaluations, had engaged in therapy for approximately two years, and was classified as "Emotionally Disturbed."  Considering these facts and the strong wording of the February 2018 order barring Max's grandparents from "facilitating or allowing any contact whatsoever between" Max and his father − an order not challenged by

Michael despite being a party in the non-dissolution action with notice of the proceedings − we perceive no basis to second-guess the judge's determination that the mere passage of time and concomitant maturation of the child since entry of the order did not establish a substantial change in circumstances to support modification of the 2018 order.

Although Michael cites Fusco v. Fusco, 186 N.J. Super. 321 (App. Div. 1982), and other cases to argue the judge should have ordered an evaluation to determine whether contact between Max and his father was in Max's best interests, we are satisfied his reliance on Fusco is misplaced. Initially, there's no indication the child in Fusco had participated in prior evaluations or was classified as emotionally disturbed before the trial court directed her participation in court-ordered evaluations. See id. at 322-24. Moreover, as the judge here correctly noted, in Fusco, there was no relation between the incarcerated father seeking parenting time and his victim. See id. at 322. Also, there was no relation between the victim and the child at issue. See ibid. Additionally, in Fusco, the incarcerated parent had visitation rights under a judgment of divorce, and the child had seen her father in prison before she was evaluated. Id. at 322-23. Accordingly, the judge here correctly found the facts

in <u>Fusco</u> were "fundamentally different" from those presented in the instant matter.

Finally, we have no quarrel with the judge's determination not to order a best interests evaluation or hold a plenary hearing. That is because discovery and a plenary hearing should not be ordered before a movant satisfies his or her burden in demonstrating a prima facie case of changed circumstances. <u>Lepis</u>, 83 N.J. at 157-59. As we have cautioned, "[n]ot every factual dispute that arises in the context of [Family Part] proceedings triggers the need for a plenary hearing." <u>Colca v. Anson</u>, 413 N.J. Super. 405, 422 (App. Div. 2010) (quoting <u>Harrington v. Harrington</u>, 281 N.J. Super. 39, 47 (App. Div. 1995)). Thus, "a plenary hearing is only required if there is a genuine, material and legitimate factual dispute." <u>Segal v. Lynch</u>, 211 N.J. 230, 264-65 (2012) (citations omitted). A party's conclusory certifications are usually insufficient. <u>Faucett</u>, 411 N.J. Super. at 128.

Here, the assertions in Michael's certification were clearly inadequate as to the "genuine issue of fact . . . bearing upon [the] critical question," i.e., Max's best interests. <u>Pfeiffer v. Ilson</u>, 318 N.J. Super. 13, 14 (App. Div. 1999). Given the judge's findings that Michael failed to demonstrate a substantial change in circumstances after the entry of the 2018 order, the judge was not obliged to

13

consider the best interests of Max anew. <u>Slawinski v. Nicholas</u>, 448 N.J. Super. 25, 36 (App. Div. 2016). Therefore, the judge properly denied Michael's requests for discovery, by way of a best interests evaluation, and a plenary hearing.

To the extent we have not addressed Michael's remaining arguments, they are without sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION